**Opinion issued July 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NOS. 01-13-00349-CV & 01-13-00610-CV

———————————

**BRENHAM OIL & GAS, INC., Appellant/Cross-Appellee**

**V.**

**TGS-NOPEC GEOPHYSICAL COMPANY, Appellee/Cross-Appellant**

**AND**

**ENI S.p.A., Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-43156**

---

## O P I N I O N

Appellant Brenham Oil & Gas, Inc. filed suit against TGS-NOPEC Geophysical Company and ENI S.p.A. Brenham Oil had pursued an oil production agreement with the Republic of Togo, but it alleged those efforts failed due to the

tortious interference of TGS, a company that gathers and markets seismic data for the hydrocarbon industry. ENI, an Italian oil company, was accused of aiding and encouraging TGS's tortious conduct.

ENI filed a special appearance and the claims against it were dismissed. TGS, a Delaware corporation headquartered in Houston, successfully moved to dismiss based on forum non conveniens. Brenham Oil appealed the dismissal of both parties. TGS cross-appealed arguing that the trial court also should have dismissed Brenham Oil's claims for lack of standing or want of subject matter jurisdiction over Togolese real property.

We affirm the dispositive orders of the trial court and dismiss the cross-appeal as moot.

**Background**

Brenham Oil & Gas, Inc. is a Texas corporation with its headquarters near Houston. The company, with its highly credentialed leadership and extensive experience in the oil-and-gas business, sought international oil-and-gas exploration investment opportunities.

In early 2010, the discovery of a large oil field off the coast of Ghana prompted Brenham Oil to investigate prospects in the waters of the neighboring country of Togo. Brenham Oil's executives, including its President, Scott Gaille, felt they were in luck: one of them was friends with an old schoolmate of the

2

Togolese president. With the help of this well-placed friend, Brenham Oil arranged for Gaille to meet in Togo with the nation's Energy Minister as well as its Director of Hydrocarbons, Léopold Mebah Siah. The May 2010 meeting included discussion of the possibility that Brenham Oil would enter into a production-sharing contract for hydrocarbons located in an area of Togolese waters denominated "Block 2." Brenham Oil was instructed that it could obtain seismic data on Block 2 by contacting TGS-NOPEC Geophysical Company. Togo had licensed this data to TGS for the purpose of marketing it to exploration companies.

Unbeknownst to Brenham Oil, Siah had written to Roger Welch, TGS's manager for Africa, asking for information about Brenham Oil prior to Gaille's arrival in Togo. Welch, who lived and worked in London, sent the following email to Siah from his London office:

> I have asked the Houston office to check on Brenham Oil & Gas also.
>
> Brenham Oil & Gas is a very small company which has mineral rights on a permit in Texas, they do not operate; the permit is operated by Anadarko. Brenham appears to be a subsidiary of a larger company American International Industries which deals in real estate, plastic products and some well service equipment, they have no experience in either the upstream or downstream oil & gas industry.
>
> None of the management team have any experience in the oil & gas industry.
>
> We do not recommend that Brenham be considered for any petroleum exploration permit in Togo.
>
> . . .

As I mentioned TGS is interpreting all of the data we have acquired offshore Togo and integrating this with our regional data base off Ghana and Benin.

Within a month we will have a report showing prospects offshore Togo showing their similarities with the Jubilee field offshore Ghana.

TGS is constantly talking with the serious oil companies exploring the Ghana, Togo & Benin margin, we will be showing the report to these companies and more.

At present the companies looking to make large investments in this margin are Chevron, Total, ENI Repsol-YPF, StatOilHydro etc.

Let's do a promotion to these types of companies.

After the meeting with Gaille, Siah wrote an email back to Welch:

It was a good meeting with M. Gaille from Brenham Oil & Gas company. We also the minister an[d] I noted that it si [sic] very small unexperienced company. We gave them copies of model PSA and hydrocarbon code. Also we told them to make contact with PGS [sic] for further information in terms of data evaluation and data licencing. Please can you brief us on data package price, licencing procedure and details of volume of data to be shown and licenerd [sic].

Thank you for your precious cooperation on this matter.

Behind the scenes at TGS, the news that Brenham Oil was talking to Togo about Block 2 was not welcome. Welch was part of TGS's Africa, Middle East, and Asia Pacific ("AMEAP") team and subordinate to David Hicks, the divisional vice president. Prior to answering Siah's inquiry about Brenham Oil, Welch had emailed Hicks and fellow AMEAP team member Kim Abdallah, both of whom worked in Houston. Welch wrote, "Do you know anything about Brenham Oil & Gas . . . . They are meeting with minister tomorrow to try and get block 2. If it is a

4

small co. they will not buy data and try to promote block—not good for us or Togo."

Brenham Oil dispatched its vice president, L. Rogers Hardy, to examine the data located at TGS's Houston headquarters. Hardy contacted Hicks, visited TGS's Houston office, and entered into a confidentiality agreement to view the information. When Hicks reported that the "guy from Brenham" had come by inquiring about the data, Welch emailed back, "I've already told Togo not to deal with them."

On May 17, Brenham Oil learned of the negative evaluation Welch had given to Siah. Gaille responded by emailing Welch, attaching a short biography to show his competence. Gaille wrote:

> I wanted to provide you with information regarding my background. Of course, you have not heard of Brenham Oil & Gas. Brenham Oil & Gas is a new vehicle that I am using to place capital in international exploration opportunities, and I am working with my network of contacts at the large oil and gas companies and governments to acquire exploration block interests. We expect to build a portfolio of approximately 10 wells over the next three years. Our goal is exposure of public and private capital to a series of high potential wells. . . .

> We would very much appreciate you and your team's support in our efforts in Togo and elsewhere, and we understand it is important that you have an accurate understanding of our background and experience. If you need a reference or have any further questions, please do not hesitate to contact me.

Four days later, Abdallah sent an email to two Houston-based TGS colleagues: AMEAP team member Juan Santana and sales representative Julie Halbison.

Abdallah instructed them how to price the data for Brenham Oil, writing, "make it high."

Welch later echoed that sentiment. In an email exchange, TGS employee Jim McNeil told Welch that he could provide Hardy "a list of the wells we have when necessary" and asked him to "please let me know if you want me to do anything at this time." Welch replied, "I'll wait until he absorbs the price," noting that Brenham Oil would likely complain about it to the government. In response to a query a few days later from Halbison about pricing the data for Brenham Oil, Welch wrote, "I don't think that this is going anywhere, Brenham will not be prepared to pay anything significant to get the block. If we get a serious company I will let you guys do the pricing."

On May 24, Brenham Oil presented Togo a proposed production-sharing agreement. In June, Gaille traveled to Togo once more and held a series of meetings with officials to work out the terms of the agreement. Yair Green, an Israeli lawyer, participated on the side of the Togolese government. By July, Brenham Oil thought that it had settled on an agreement with Togo: its Board had approved the prospective agreement, and emails were exchanged about scheduling a signing ceremony in Paris. However, the parties never met in Paris and no agreement was signed. As the months went by, Gaille continued to press Green about signing the agreement. In October, Brenham Oil learned through news

reports that Togo had entered an agreement to develop Block 2 with ENI S.p.A., the Italian oil company that ultimately would drill in Block 2.

ENI's investigation of exploration opportunities near Togo and negotiations for the purchase of seismic data had been underway since before Brenham Oil's initial May 2010 meeting there. As early as January 2010, TGS's AMEAP employee Sara Stephens, based in London, was communicating by email with Illiberi Leonardo, an ENI employee in Milan, promoting the sale of TGS's data to ENI. By March, Stephens was working with AMEAP employee Juan Santana, based in Houston, and TGS sales coordinator Jana Spencer, also in Houston, on finalizing a licensing agreement. In April, Stephens, who continued to communicate with Leonardo and ENI on behalf of TGS, was complaining of ENI's delay in consummating the sale. The delays were troubling to Santana and the other TGS team members.

At the end of May, Santana emphasized to his colleagues the importance of concluding the sale with ENI. In a series of emails, he wrote, "We need ENI bad!" and "FYI, WE NEED ENI . . . to reach forecast. Take no prisoners. . . . show me the money!" Nonetheless, it was only in November 2010, after ENI had entered into a production agreement with Togo, that the sale of seismic data was completed.

Brenham Oil initially filed suit against TGS and an American ENI subsidiary, ENI Petroleum Co. Inc. However, Brenham Oil later nonsuited the subsidiary and amended its pleadings to sue the parent, ENI, S.p.A., directly. Brenham Oil alleged that TGS had tortiously interfered with its prospective business relations with Togo "by making false, negligent, intentional, fraudulent, and/or defamatory statements to Togolese officials." Brenham Oil relied especially upon the email Welch sent to Siah calling Brenham Oil "a very small company" and recommending that it not be considered for a petroleum exploration permit. Brenham Oil further alleged that ENI knowingly assisted or encouraged TGS's tortious acts.

ENI filed a special appearance arguing that the court lacked jurisdiction over it. The trial court granted the special appearance and dismissed the claims against ENI. Brenham Oil promptly filed notice of an accelerated appeal.

Litigation continued in the trial court between Brenham Oil and TGS, which filed several dispositive motions: a motion to dismiss based on forum non conveniens; a motion to dismiss for lack of subject-matter jurisdiction; a motion for summary judgment alleging lack of standing and inability to prove damages; and a "Final Motion for Summary Judgment," tackling the merits of Brenham Oil's tortious interference claim. In its motion to dismiss for forum non conveniens, TGS claimed that the case should be litigated in Togo, not Harris County. After

holding multiple hearings, entertaining extensive briefing, and receiving evidence, the trial court ultimately granted the forum non conveniens motion and dismissed the case without ruling on TGS's other dispositive motions. Brenham Oil timely filed notice of appeal. TGS then filed a cross-appeal.

**Analysis**

## I. ENI's special appearance

Brenham Oil argues that the trial court erred by granting ENI's special appearance. It contends that the trial court had both general and specific jurisdiction over ENI.

### A. Brenham Oil's motion to strike affidavit

As a preliminary matter, Brenham Oil argues that the trial court erred by denying its motion to strike an affidavit ENI offered in support of its special appearance. ENI employee Marco Bollini's detailed affidavit, dated May 24, 2012, was phrased in the present tense but noted that its statements were "true and correct now and for all applicable time frames involving the plaintiff's allegations in this case." It contained a litany of specific denials supporting his employer's assertion that while it has numerous American subsidiaries that do business in Texas, ENI itself has no presence in Texas. For example, Bollini denied that ENI "sell[s] goods or provide[s] any services in Texas," and he asserted that ENI "does not and has never maintained an office or any other facility in Texas."

Brenham Oil presents two reasons why the affidavit should have been struck. Both relate to paragraph 18, which stated:

> A small number of ENI S.P.A. employees may be assigned to ENI S.P.A. subsidiaries in the United States on a temporary basis. During the term of a temporary assignment, an assigned employee enters into an employment agreement with the U.S. subsidiary that has the right to direct and control the details of the employee's work. ENI S.p.A. relinquishes the right to direct and control the details of any assigned employee's work. Accordingly, the subsidiary to which an employee is assigned pays all compensation during his or her term of assignment.

Brenham Oil contends that the entire affidavit should be struck because it is materially false. In the alternative, it argues that the challenged paragraph should be struck as conclusory.

We review a trial court's ruling on a motion to strike an affidavit or portion thereof for abuse of discretion. *In re BP Prods. N. Am., Inc.*, 263 S.W.3d 106, 117 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding). A trial court may determine a special appearance on the basis of affidavits. *See* TEX. R. CIV. P. 120a(3). The affidavits, however, must "be made on personal knowledge" and "set forth specific facts as would be admissible in evidence." *Id.* Consequently, the affidavits used must be direct, unmistakable, and unequivocal as to the sworn facts, allowing perjury to be assigned on them. *Wright v. Sage Eng'g Inc.*, 137 S.W.3d 238, 250 n.8 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

10

Brenham Oil argues that paragraph 18 is materially false because it partly contradicts numerous letters of invitation sent by ENI US Operating Co. Inc. to the United States Consulate in Milan regarding working visits to the United States by ENI S.p.A. employees. For example, a letter submitted on June 25, 2009 by ENI US Operating Co. on behalf of Chiara Guiducci, said:

> This is to explain the business visit to the United States by Ms. Chiara Guiducci. She is currently employed by ENI S.p.A. in San Donato, Italy in the position of Lead Reservoir Engineer for ENI S.p.A. Exploration and Production.
>
> . . . . ENI US Operating Co. Inc. would like to invite Ms. Chiara Guiducci to attend meetings on behalf of and as an employee of ENI S.p.A. She will be visiting and attending meetings relating to the Kashagan Field Development project.
>
> Ms. Chiara Guiducci will continue to be an employee of ENI S.p.A. and will remain on its payroll throughout her staying the United States. She will receive no remuneration in the United States.

Other letters, dated as early as January 2008 and as late as July 2010, use similar language. Brenham Oil points out that the claims in the letters that an employee "will continue to be an employee of ENI S.p.A. and will remain on its payroll" contradict the statements in Bollini's affidavit that "an assigned employee enters into an employment agreement with the U.S. subsidiary that has the right to direct and control the details of the employee's work," that ENI S.p.A. "relinquishes the right to direct and control the details of any assigned employee's work," and that

11

"the subsidiary to which an employee is assigned pays all compensation during his or her term of assignment."

Despite the difference between the affidavit submitted by ENI and the documentation noted by Brenham Oil, the comparison does not conclusively establish that the statements in Bollini's affidavit are false. ENI correctly notes that, while the invitation letters identified by Brenham Oil indicate that ENI employees who visited Texas would remain on ENI's payroll, the letters were each written in the future tense to describe proposed visits. As such, the letters were not direct evidence of the eventual employment arrangement for the visiting employees. Perhaps more compellingly, Bollini's affidavit statement that the U.S. subsidiary "pays all compensation" during a temporary assignment is not inherently at odds with that employee remaining on the parent's "payroll" during that time. Both statements could be true if the subsidiary reimbursed the parent for the costs of the employee's compensation during the temporary assignment. *See, e.g.*, *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 176 (Tex. 2007) (discussing parent–subsidiary arrangement in which subsidiary's executives received paychecks from parent, but funds for paychecks came from subsidiary's revenues).

In any case, Brenham Oil also offers no authority for the proposition that statements in an affidavit should be struck for the reason that they that conflict

with other statements by the same party or its subsidiary on the same subject matter. The fact that an affidavit submitted by a corporate party contradicts another piece of evidence in the record, even if the other evidence is a statement of the party's subsidiary, does not conclusively establish that the affidavit is false or perjurious. *Cf. Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (Tex. 1988) (per curiam) ("[I]f conflicting inferences may be drawn from a deposition and from an affidavit filed by the same party in opposition to a motion for summary judgment, a fact issue is presented."). Such a conflict in the evidence merely presents the trial court with a fact issue, *see id.*, to be resolved with the merits of the special appearance.

Brenham Oil argues in the alternative that the affidavit should have been struck because paragraph 18 is conclusory. Specifically, it contends that the assertion, "ENI S.p.A. relinquishes the right to direct and control the details of any assigned employee's work," is conclusory because it is unaccompanied by statements of relevant underlying facts. It relies on a prior decision, *Golden Agri–Resources Ltd. v. Fulcrum Energy LLC*, No. 01–11–00922–CV, 2012 WL 3776974 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem. op.), in which this court held that the trial court did not abuse its discretion in striking certain statements in an affidavit supporting a special appearance as conclusory. 2012 WL 3776974 at *11.

13

We disagree because *Golden Agri-Resources* is distinguishable. Unlike the affidavit in that case, the challenged statement in Bollini's affidavit was supported by additional factual statements regarding the nature of the control purportedly exerted by the other entities. The Bollini affidavit affirmed that "an assigned employee enters into an employment agreement with the U.S. subsidiary" and that "the subsidiary to which an employee is assigned pays all compensation during his or her term of assignment." Both claims, that an agreement existed between the assigned employee and the subsidiary and that the subsidiary paid the employee's wages, are "direct, unmistakable, and unequivocal as to the sworn facts, allowing perjury to be assigned on them." *See Wright*, 137 S.W.3d at 250 n.8. Indeed, Brenham Oil's first argument, that the statements in the affidavit are perjurious because they contradict the statements contained in the letters from the subsidiary to the American consulate, illustrates the manner in which allegations of perjury may be leveled against claims that an employment agreement existed or that wages were paid by a particular entity.

We further note the difference in the procedural postures of this appeal and *Golden Agri-Resources*. As noted above, a trial court's ruling on a motion to strike a portion of an affidavit is reviewed for abuse of discretion. *In re BP Prods.*, 263 S.W.3d at 117. In *Golden Agri-Resources*, we affirmed a ruling striking an affidavit, finding that ruling to have been within the trial court's discretion. *See*

*Golden Agri-Resources*, 2012 WL 3776974 at \*11. Likewise, we find no abuse of discretion here: the trial court did not abuse its discretion in denying Brenham Oil's motion to strike.

### B. Personal jurisdiction

Brenham Oil argues that even if the trial court did not abuse its discretion in refusing to strike Bollini's affidavit, the record before the trial court establishes that the court had both general and specific jurisdiction over ENI. Since questions of general and specific jurisdiction present different inquiries, we will address both arguments in turn.

Texas courts may assert personal jurisdiction over a nonresident defendant if the long-arm statute authorizes it and the exercise is consistent with due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). Given the broad scope of the Texas long-arm statute, an assertion of jurisdiction that comports with guaranties of due process under the standard of the federal constitution will invariably fall within the statute's ambit. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

The touchstone of jurisdictional due process is "purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Before a court may exercise jurisdiction over a nonresident defendant, there must be "some act by which the defendant purposefully avails itself of the privilege of

conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958).

The Supreme Court of Texas has identified three significant aspects of purposeful availment. *Michiana*, 168 S.W.3d at 785. "First, it is only the defendant's contacts with the forum that count[.]" *Id.* A defendant should not be called to court in a jurisdiction solely as a result of the unilateral activity of another party or third person. *Id.* "Second, the acts relied on must be 'purposeful' rather than fortuitous." *Id.* "Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S. Ct. 2174, 2182 (1985)). "A defendant will not be hailed into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S. Ct. 1473, 1478 (1984)). "Third, a defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Id.* "Jurisdiction is premised on notions of implied consent—that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.* "By contrast, a nonresident may purposefully avoid a particular jurisdiction by

structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Id.*

Depending on their character and extent, a defendant's contacts can vest a court with either specific or general jurisdiction. *Coleman*, 83 S.W.3d at 806. In order for a court to exercise specific jurisdiction, the defendant's forum contacts must be purposeful and the cause of action must arise from or relate to those contacts. *Id.* In contrast, general jurisdiction allows a defendant to be pulled into court even if the cause of action did not arise from or relate to a defendant's contacts with the forum. "General jurisdiction is present when a defendant's contacts with a forum are 'continuous and systematic,' a more demanding minimum-contacts analysis than specific jurisdiction." *Id.* In either case, the defendant's forum contacts must be such that it should "reasonably anticipate" being called into a Texas court. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).

Besides requiring that defendants have the necessary "minimum contacts" with a forum, due process also requires that the exercise of jurisdiction over the person of the defendant comport with "traditional notions of fair play and substantial justice." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). If a defendant contends that being forced to defend a suit in the foreign forum offends

these notions, it is incumbent on it to present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

Whether a court has jurisdiction over a defendant is a question of law, but one that frequently requires a trial court to resolve questions of fact before making its determination. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In this case, the trial court did not enter findings of fact and conclusions of law in relation to its ruling on ENI's special appearance. Consequently, all facts necessary to support the ruling and supported by the evidence are implied. *Id.* at 795. Legal questions, on the other hand, are considered de novo. *See id.*

The Supreme Court of Texas has provided guidance on how to allocate the burden of proof in a special appearance dispute. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Id.* at 658. ENI does not contest that Brenham Oil carried

18

this initial burden. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.*

"The defendant can negate jurisdiction on either a factual or legal basis." *Id.* at 659. "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.* "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* (footnote omitted). Alternatively, the defendant can make a legal argument. It can show that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

### 1. General jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them

essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014). General jurisdiction is thus described as "dispute-blind." *PHC-Minden*, 235 S.W.3d at 168. "It involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *Id.* (citation omitted) "Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Id.* (quoting 4 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (2007)). As such, a general jurisdiction inquiry involves a "more demanding minimum contacts analysis, with a substantially higher threshold" than a specific jurisdiction inquiry. *Id*. In conducting the contacts analysis, "we do not view each contact in isolation." *Coleman*, 83 S.W.3d at 809. "All contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuous and systematic activity." *Id*.

To begin, we note that the affidavit of Marco Bollini, with which ENI supported its special appearance, contained a laundry list of denials. Bollini denied, among other things, that ENI:

- is registered to do business in Texas;

20

- maintains an agent who is authorized to receive service of process;

- conducts "any operations in Texas";

- sells goods or provides services in Texas;

- directs advertising toward Texas residents;

- pays any employees "that reside in Texas";

- has any employees in Texas over which it maintains the right to direct or control the details of their work;

- maintains an office or any other facility in Texas

- owns or leases any real or personal property in Texas; or,

- has a telephone listing, post office box, or mailing address in Texas.

Bollini acknowledged, however, that ENI has several direct or indirect American subsidiaries that maintain offices or have their headquarters in Texas. At the same time, he averred that ENI: "does not direct or control the day-to-day operations of any of these subsidiaries or their employees;" that it maintains separate bank accounts, accounting systems, and payroll systems; and that its subsidiaries do not commingle corporate assets.

In support of its contention that ENI is subject to general jurisdiction in Texas, Brenham Oil notes evidence of a trip by ENI executives to an industry conference in Houston where they met with representatives of several oil companies, as well as two trips by ENI's CEO to Texas for business meetings and speaking engagements. Brenham further observes that on 39 occasions between 2009 and 2012, other ENI employees visited Texas on business trips for the

21

company, as evidenced by numerous letters of invitation from Texas subsidiary ENI US Operating Co. to the American consulate in Milan. The stated purpose of these visits generally was to work with or advise ENI's Texas subsidiaries. Finally, Brenham points to evidence that ENI assumed an active role in negotiating a lease of Houston office space on behalf of ENI US Operating Co. ENI employees traveled to Houston to survey the property and offer support in making the new offices match the "ENI standard." ENI also required its subsidiary to submit a cost estimate.

Although Brenham Oil emphasizes these ENI activities on behalf of its subsidiaries as a basis for jurisdiction, it does not deny that the subsidiaries are separate corporate entities or contend that the subsidiaries are merely ENI's "alter egos." *See Preussag Aktiengesellschaft v. Coleman*, 16 S.W.3d 110, 118 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (plaintiffs did not argue alter ego theory, under which subsidiaries' contacts are attributable to parent, on appeal).

The number of visits by ENI executives to Texas to attend industry conferences and meet with other oil companies matters little in determining whether ENI was essentially at home in Texas. *See Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416–18, 104 S. Ct. 1868, 1873–74 (1984) (explaining that single trip by CEO to Houston for purpose of negotiating contract

22

"cannot be described or regarded as a contact of a 'continuous and systematic' nature"). "Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact with the state." *Waterman S.S. Corp. v. Ruiz*, 355 S.W.3d 387, 410 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). In *Helicopteros*, a history of more numerous and systematic visits was deemed inadequate to uphold a Texas court's assertion of general jurisdiction. There, the United States Supreme Court found that a Colombian helicopter operator which dispatched managers and technicians to view the Texas plants of its helicopter manufacturer and regularly sent its pilots to the state for training was not subject to general jurisdiction in Texas. *Helicopteros*, 466 U.S. at 418, 104 S. Ct. at 1874. As the Colombian company had no other operations in the state, *see id.* at 411, 104 S. Ct. at 1870–71, these visits by its employees were inadequate to vest Texas courts with general jurisdiction. *Id.* at 418, 104 S. Ct. 1874.

Nevertheless, Brenham Oil contends that the visits by ENI employees to its Texas subsidiaries are contacts that establish general jurisdiction. Brenham Oil insists that the invitation letters to the consulate written by ENI US Operating Co. Inc. state the truth about the ENI employees who visited Texas. It maintains that these letters establish that the employees remained on the payroll and under the control of ENI, thus defeating ENI's secondment theory. Accordingly, Brenham Oil relies on several cases affirming general jurisdiction over parent companies

23

that paid and controlled employees in Texas. However, Bollini's affidavit established that ENI employees entered into employment agreements with ENI subsidiaries, which paid all compensation for the employees. He further averred that ENI S.p.A. relinquished the right to direct and control the details of those employees' work. "Whether an employee is seconded to a borrowing employer is a question of law that depends upon factual determinations of whether the borrowing employer has the right to direct and control the borrowed employee with respect to the details of the particular work." *Golden Agri-Resources*, 2012 WL 3776974 at *11 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2003)). Under Texas law, seconded employees are considered employees of the borrowing employer. *Deloitte & Touche Neth. Antilles & Aruba v. Ulrich*, 172 S.W.3d 255, 265–66 (Tex. App.—Beaumont 2005, pet. denied). Here, Bollini's affidavit supports a factual determination that the ENI subsidiaries had the right to direct and control the work of the borrowed employees. *BMC Software*, 83 S.W.3d at 795. Accordingly, the record supported a legal determination that the visiting employees became the employees, though borrowed, of the subsidiaries, and did not give rise to contacts with Texas. *See Deloitte & Touche*, 172 S.W.3d at 265–66.

Brenham Oil relies further on *Villagomez v. Rockwood Specialties, Inc.*, 210 S.W.3d 720 (Tex. App.—Corpus Christi 2006, pet. denied), for the proposition

24

that, apart from an alter ego theory under which a subsidiary is fused with its parent for purposes of contacts analysis, a parent's ownership of a subsidiary and its activities directed at that subsidiary in the forum state are themselves contacts that may establish general jurisdiction. Brenham Oil thus contends that ENI's practice of dispatching its employees from Italy to Texas to advise its Texas subsidiaries, as well as negotiating a lease of Texas real estate on a subsidiary's behalf, are forum contacts that subject ENI to general jurisdiction in this state. Furthermore, Brenham Oil argues that the visits by ENI employees to Texas to work with ENI subsidiaries demonstrate that "ENI continuously and systematically sent its employees to Texas for various length of time."

A parent corporation's ordinary, "normal," or "routine" interactions with its subsidiaries, outside an alter ego theory, do not alone suffice to subject the parent to jurisdiction in the state of the subsidiary. *Preussag*, 16 S.W.3d at 118–120, 123. In *Preussag*, the plaintiffs contended that a German holding company was subject to jurisdiction based on its system of ordering and facilitating the operations of its subsidiaries in Texas, which the court characterized as its "normal, corporate actions within the Preussag group system." *Id.* at 118. These actions were "occasional audits; unified financial procedures for the annual reporting required by German law; a unified 'banking' system, involving loans and intercompany payments and requiring some deposits into the subsidiaries' Texas bank accounts;

25

parent approval of large expenditures and budgets; consideration of adopting a group benefits system; and the communications and visits that accompany these activities." *Id.* at 118–19. Absent any alter ego theory, which the appellees had specifically disavowed, this court concluded that Preussag was not subject to jurisdiction in Texas on the basis of its routine interactions with its subsidiary. *Id.* at 123–25.

Here, the undisputed evidence shows that over a period of more than three years, from October 2008 to March 2012, ENI employees took 39 trips to Texas for various purposes. For example, employees traveled to Texas for a "meeting to review regional operations of Eni Subsidiaries," to provide "consulting services to ENI U.S. entities" in support of business negotiations, to "conduct training and technology support," and to "review U.S. market and operations." Furthermore, implying a finding of all facts necessary to support the trial court's ruling that are supported by the evidence, *BMC Software*, 83 S.W.3d at 795, the evidence before the trial court supported the conclusion that ENI had some involvement with a lease of real property in Texas by one of its subsidiaries, but ENI's direct participation was limited to approving expenditures and ensuring that building security guidelines were met.

This evidence does not demonstrate that these activities relating to the support and oversight of ENI's Texas subsidiaries exceeded the "normal parent–

26

subsidiary relationship." *Id.* at 125. In *Preussag*, the trial court deemed a visit to inspect and other monitoring activities—such as periodic audits and approving large expenditures—a component of normal parent–subsidiary relations which would not subject the parent to general jurisdiction in Texas. *Id.* at 124–25. ENI's actions regarding its subsidiary's leased office property are no different. Furthermore, although the descriptions contained in Bollini's declaration, for example, "consulting services," are vague, the evidence does not demonstrate that these activities went beyond ordinary parent–subsidiary dealings. Accordingly, these visits were not shown to be continuous and systematic contacts with Texas. *See id.*

Importantly, in *Villagomez*, the court did not hold that ownership of a subsidiary alone is sufficient to subject the parent corporation to general jurisdiction. *See Villagomez*, 210 S.W.3d at 732 (explaining that while "ownership of a local-operating subsidiary may not be enough for minimum contacts outside the context of alter ego or similar conceptual devices, it is nonetheless error to exclude this legitimate forum contact from consideration *in toto* with the defendant's other forum contacts"). On the contrary, the court considered the particular dealings of the parent with its subsidiary in order to arrive at its minimum-contacts findings. *See id.* at 734–40. Significantly, the parent corporation

in *Villagomez* had directly contracted to engage a president for its Texas subsidiary. The contract said:

> We are pleased to confirm our offer of employment as President and Managing Director of our Clay Additives business on a full-time and exclusive basis. For purposes of facilitating your employment, you will be assigned to and employed by our subsidiary . . . . It is our understanding that you will commence employment on or before August 20, 2001. You will have direct reporting responsibility to the President of Rockwood Specialties, Inc. (hereinafter "Rockwood"). We reserve the right, at our discretion, to change your responsibilities or job title at any time.

*Id.* at 734. Although the person hired to serve as president considered the subsidiary his employer, the court found it clear, "both in practice and by written agreement," that he was "directly accountable" to the parent. *Id.* at 742. As the court explained, the parent had contracted directly with the president to make him "ultimately accountable for the profitability of [the subsidiary's] business in Texas . . . ." *Id.* In doing so, the parent "extended directly into Texas its business of owning other businesses and directly facilitating their profitability." *Id.* Rather than have the president contract with the subsidiary, the parent company "chose to enter Texas to contract and interact" with the president "directly in its corporate capacity as [the parent], not from behind the veil of [the subsidiary's] board of directors." *Id.*

In sum, the general jurisdiction finding in *Villagomez* rested in large part on the parent's decision to contract directly with the person it wanted at the helm of its

Texas subsidiary, to require that person to report directly to the parent's president, and to retain for itself the right to remove him from that position. *See id.* The facts in this case are easily distinguishable from those in *Villagomez*. Here, ENI submitted evidence in the form of Bollini's affidavit that supports an implied finding that ENI did not retain the right of control over any employee working for its US subsidiaries. *See BMC Software*, 83 S.W.3d at 795. Accordingly, we do not view ENI's actions directed toward its subsidiaries as sufficient minimum contacts to subject ENI to general jurisdiction. *See Preussag*, 16 S.W.3d at 124–25.

Finally, Brenham Oil attempts to distinguish *Helicopteros* on the basis that the nature of ENI's contacts with Texas support general jurisdiction because those contacts were "central" to ENI's business. To support its argument, Brenham Oil points to two cases involving bank defendants that maintained no offices or employees in the forum, but nevertheless made loans to residents in the forum. *See Lakin v. Prudential Secs., Inc.*, 348 F.3d 704, 708–10 (8th Cir. 2003); *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434 (3d Cir. 1987); *see also RSR Corp. v. Siegmund*, 309 S.W.3d 686, 708 (Tex. App.—Dallas 2010, no pet.). Although the bank defendants argued that the loans were insufficient to establish general jurisdiction because the total loan amounts represented a small fraction of their total loan portfolios, the courts deemed general jurisdiction appropriate, noting that the lines of credit at issue were "central to the conduct of the [banks']

29

business." *Lakin*, 348 F.3d at 709; *Provident Nat'l Bank*, 918 F.2d at 438. Thus, Brenham Oil reasons, general jurisdiction is appropriate here because visits to Texas by ENI employees are "central" to ENI's business. Brenham Oil does not argue how the visits of ENI S.p.A.'s employees to Texas are "central" to its business, other than by stating that the visits constitute contacts closer to those of the bank defendants in *Lakin* and *Provident Nat'l Bank* than those of the defendant in *Helicopteros*.

As we concluded above, the record supports a determination that the 39 visits by ENI employees described in Bollini's supplemental declaration do not exceed the scope of the normal parent–subsidiary relationship. *See Preussag*, 16 S.W.3d at 124–25. The record similarly supports a determination that those visits were not "central" to ENI's business in the same way that making loans is central to the business of a bank. *Cf. Lakin*, 348 F.3d at 709–10. Moreover, the *Lakin* and *Provident Nat'l Bank* courts did not confine their analysis to whether the defendants' contacts with the forum were "central" to their business. Rather, those courts properly focused on whether the banking activity with the forum was "continuous and systematic," *Lakin*, 348 F.3d at 709, observing that the banks' actions constituted "substantial, ongoing, and systematic activity" in the forum. *Provident Nat'l Bank*, 819 F.2d at 438. By contrast, Bollini's supplemental declaration indicated ENI employees took only 39 visits to Texas between 2008

30

and 2012. Such visits are a far cry from the "continuous and systematic" contacts of the bank defendants in *Lakin* and *Provident Nat'l Bank*. *See Lakin*, 348 F.3d at 709 (determining that bank defendant made loans that "can represent the establishment of lending relationships with hundreds, if not thousands of [the forum's] residents"); *Provident Nat'l Bank*, 819 F.2d at 438 (observing that bank defendant "conducted business regarding [the] account with [a bank in the forum] every business day"). Thus, unlike the bank accounts held and accessed continuously in a forum state, the periodic visits of ENI employees to Texas "cannot be described or regarded as a contact of a 'continuous and systematic' nature." *Helicopteros*, 466 U.S. at 416, 104 S. Ct. at 1873.

In sum, the record supports implied findings necessary to uphold the legal determinations that ENI does not operate in Texas, and that its activities on behalf of Texas subsidiaries were confined to normal parent–subsidiary relations. *See BMC Software*, 83 S.W.3d at 795; *Preussag*, 16 S.W.3d at 126. Viewing all of the contacts together, *Am. Type Culture Collection*, 83 S.W.3d at 809, we hold that ENI's contacts with Texas were not shown to be sufficiently continuous and systematic as to render it "essentially at home" in Texas. *See Goodyear*, 1315 S. Ct. at 2851. Therefore, Brenham Oil failed to demonstrate that ENI is subject to general jurisdiction in Texas.

## 2. Specific jurisdiction

While general jurisdiction is dispute-blind, specific jurisdiction takes into account the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76. Specific jurisdiction "arises when (1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Kelly*, 301 S.W.3d at 658. "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585.

Brenham Oil's petition named one cause of action against ENI: aiding and abetting the torts of TGS. However, these allegations were not tied to factual assertions. The only references to ENI in the fact section of Brenham Oil's petition concern non-tortious conduct. For example, Brenham Oil alleged that ENI was negotiating a sale of seismic data with TGS, it ultimately was awarded the right to drill in Block 2 from Togo, it concluded the purchase of seismic data from TGS only after obtaining rights in Block 2, and it is presently drilling off the Togolese coast.

The petition also alleged that at "all times material to this lawsuit, Eni S.p.A. was doing business in Houston, Harris County, Texas." This was sufficient to carry

Brenham Oil's initial burden of pleading jurisdictional facts. *See George v. Deardorff*, 360 S.W.3d 683, 687 (Tex. App.—Fort Worth 2012, no pet.); *Huynh v. Nguyen*, 180 S.W.3d 608, 619 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Because Brenham Oil alleged sufficient jurisdictional facts in its petition, the burden shifted to ENI to negate all bases of jurisdiction alleged. *See Kelly*, 301 S.W.3d at 658. Launching a factual challenge to the jurisdictional allegations, ENI attached the Bollini affidavit to its special appearance. The affidavit, by way of numerous negations, effectively denied that ENI does business in Texas. For example, it affirmed that it does not have a mailing address or office in the state, does not sell goods or services in Texas, and does not direct advertising towards Texas. The affidavit also addressed the allegations in Brenham Oil's petition regarding ENI's relationship with TGS:

> With regard to the facts alleged by the Plaintiff, Eni S.p.A. employees communicated with one employee of TGS-NOPEC Geophysical Company ("TGS"), Sara Stephens, who is based in Texas, regarding a license for the use of geophysical data related to the Togolese Republic ("Togo"). Ms. Stephens traveled to Milan, Italy in early 2010 for the only meeting that took place related to the licensing of this data. No Eni S.p.A. employee ever traveled to Texas in connection with the data licensing. All of these employees were located in Italy at the time and still are located there.
>
> . . . .
>
> Eni S.p.A. has never committed a tort in whole or in part in Texas.

33

These statements in Bollini's affidavit corresponded to the factual allegations in Brenham Oil's petition. They admit that ENI negotiated for and purchased seismic data from TGS. Apart from this non-tortious conduct, Brenham Oil's petition was devoid of specific Texas-linked factual allegations regarding the alleged aiding and abetting. Given that the defendant's burden to negate jurisdiction is "tied to the allegations in the plaintiff's pleading," *id.*, ENI adequately negated the jurisdictional allegations by denying particular associations with Texas and concluding with the factual assertion that it had "never committed a tort in whole or in part in Texas."

Once ENI had offered evidence to negate the jurisdictional allegations contained in the petition, the burden returned to Brenham Oil to "respond with its own evidence that affirms its allegations." *Id.* at 659. In its reply to ENI's special appearance, Brenham Oil pointed to evidence illustrating the history of negotiations between ENI and TGS over the data, the intense pursuit of the deal with ENI by TGS's AMEAP employees, and the fact that ENI ultimately purchased the data after it had been awarded the concession from Togo. In particular, Brenham Oil relied on ENI's communications with TGS employees in Houston. For example, although Stephens was based in London, her emails to ENI made clear that she was working as part of a team with leadership in Houston. Occasionally, ENI employees communicated by email with TGS employees in

Houston, such as Santana. When ENI had trouble accessing the purchased data from TGS over the Internet, TGS sent a hard drive from Houston to ENI's Milan office. This evidence, however, failed to show "a substantial connection between those contacts," i.e. the negotiations with TGS to acquire data, "and the operative facts of the litigation." *See Moki Mac*, 221 S.W.3d at 585.

In *Moki Mac*, Texas parents sued a Utah river-rafting outfitter for negligence after their son died on one of the company's trips to the Grand Canyon in Arizona. *Id.* at 573. The outfitter filed a special appearance contesting personal jurisdiction. *Id.* The Supreme Court of Texas ultimately found that the state's courts lacked specific jurisdiction over the parents' claims. *Id.* at 588. While the outfitter had directed advertising to Texas that the parents asserted they relied upon, the Court reasoned that the operative facts of their claims did not pertain to the advertising but rather to what occurred during the outing in Arizona. *See id.* at 584–88. The Court wrote:

> Certainly on a river rafting trip safety is a paramount concern, and we accept as true the [parents'] claim that [their son] might not have gone on the trip were it not for [the outfitter's] representations about safety. However, the operative facts of the [parents'] suit concern principally the guides' conduct of the hiking expedition and whether they exercised reasonable care in supervising [the son]. The events on the trail and the guides' supervision of the hike will be the focus of the trial, will consume most if not all of the litigation's attention, and the overwhelming majority of the evidence will be directed to that question. Only after thoroughly considering the manner in which the hike was conducted will the jury be able to assess the [parents'] misrepresentation claim.

*Id.* at 585. Thus, *Moki Mac* teaches that identifying the operative facts of a claim in order to analyze whether a court has specific jurisdiction is tantamount to identifying the facts that "will be the focus of the trial." *See id.*

Brenham Oil alleged that ENI aided and abetted the alleged torts of TGS. In broad terms, it accused ENI of "substantially assist[ing] and/or encourag[ing] TGS to make false . . . and/or defamatory statements to Togolese officials regarding Brenham Oil & Gas," and of "substantially assist[ing] TGS in causing the tortious interference." As such, the focus at a trial on this claim—i.e., the operative facts of the claim—would be acts or communications assisting or encouraging TGS to malign Brenham Oil or otherwise interfere with its prospective business relations with Togo. However, Brenham Oil neither alleged nor offered evidence of particular tortious acts or communications by ENI directed at TGS, Brenham Oil, or Texas. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982) (holding that court lacked specific jurisdiction over foreign defendants when "no specific acts of conspiracy or misrepresentations" were attributed to them). The Texas-linked evidence relied upon by Brenham Oil pertains only to ENI's nontortious conduct in the purchase of seismic data from TGS. These forum contacts are not the operative facts of the litigation and therefore are not contacts that will support an exercise of specific jurisdiction. *See Moki Mac*, 221 S.W.3d at 585.

Nevertheless, Brenham Oil relies on four cases to support its argument that the trial court had specific jurisdiction over this case. The first case, *H. Heller & Co., Inc. v. Louisiana-Pacific Corp.*, is inapposite because it involved a post-judgment attack on a foreign judgment and therefore involves a highly deferential standard of review. 209 S.W.3d 844, 849 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (requiring "the judgment debtor to prove by clear and convincing evidence that the foreign judgment should not be given full faith and credit")

Each of the other three cases emphasized that specific jurisdiction was proper because the asserted claims arose directly from the defendants' contacts with Texas that also constituted the operative facts of the litigation. *See Paul Gillrie Inst., Inc. v. Universal Computer Consulting, Ltd.*, 183 S.W.3d 755, 763–64 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding in a libel suit that an out-of-state publisher's conduct gave rise to plaintiff's claims because the distribution of defamatory statements actually took place in Texas); *see also Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 285 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that a nonresident defendant's contract with a Texas-based engineer to design an inspection procedure for a wing spar supported specific jurisdiction when the plaintiffs asserted negligence in the design and inspection of the wing spar); *Glenco Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 167 (Tex. App.—Fort Worth 2008, no pet.) (holding that telephone board meetings

37

involving Texas participants were the operative facts of the case and thus showed purposeful availment). Unlike the plaintiffs in the foregoing cases, Brenham Oil does not allege forum contacts that are substantially connected to the operative facts of the litigation.

Because Brenham Oil's claims against ENI do not arise from the alleged forum contacts, the trial court did not err by dismissing them for lack of specific jurisdiction. *See Kelly*, 301 S.W.3d at 659. Brenham Oil's issue is overruled.

## II.     TGS's motion to dismiss for forum non conveniens

Brenham Oil also asserts that the trial court erred by granting TGS's motion to dismiss for forum non conveniens. It argues that Togo is neither an available nor an adequate forum in which to bring its claim against TGS and that the traditional private- and public-interest factors favor litigation in Harris County.

An appellate court will reverse a trial court's forum non conveniens determination only if the record shows a clear abuse of discretion. *See Quixtar Inc. v. Signature Mgmt. Team, LLC*, 315 S.W.3d 28, 31 (Tex. 2010) (per curiam). A trial court abuses its discretion when it acts without reference to guiding rules or principles. *Id.* If the trial court has considered all the relevant private- and public-interest factors, and its balance of the factors is a reasonable one, its decision deserves substantial deference. *Id.* An appellate court should not conduct a de novo review by reweighing each of the factors. *See id.* at 35 (explaining that appellate

38

court erred when it "mechanically re-weighed the [forum non conveniens factors] under the scope of an excessive burden of proof").

"The 'central focus of the *forum non conveniens* inquiry is convenience.'" *Id.* at 33 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S. Ct. 252, 262 (1981)). The doctrine permits courts to dismiss a claim based on practical consideration that affect litigants, witnesses, and the justice system. *See id.* at 34–35. It allows a court to dismiss an impracticable action even when it has jurisdiction and venue as to the parties and claims. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S. Ct. 839, 842 (1947); *In re Smith Barney, Inc.*, 975 S.W.2d 593, 596 (Tex. 1998).

In deciding motions to dismiss based on forum non conveniens, Texas courts follow the analysis of the United States Supreme Court in *Gulf Oil*. *See Quixtar*, 315 S.W.3d at 33–34; *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677–78 (Tex. 2007) (plurality op.); *Benz Grp. v. Barreto*, 404 S.W.3d 92, 96 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The parties here agree that the dismissal was predicated on the common law, as opposed to the Texas forum non conveiens statute, but courts in Texas "regularly consider United States Supreme Court precedent in both our common law and statutory forum non conveniens cases." *Quixtar*, 315 S.W.3d at 32.

The burden of proof on a forum non conveniens motion lies with the defendant. *Id.* at 31. "A defendant seeking forum non conveniens dismissal 'ordinarily bears a heavy burden in opposing the plaintiff's chosen forum.'" *Id.* This burden is relaxed when the plaintiff is not a resident of the forum but is typically at full strength when the plaintiff is a forum resident. *Id.* Nonetheless, the burden is also diminished when "the plaintiff is a corporation that has chosen to conduct extensive business in foreign countries and then is injured or defrauded in the foreign venue as a result of those business transactions." *Vinmar Trade Fin., Ltd. v. Util. Trailers de Mex., S.A. de C.V.*, 336 S.W.3d 664, 678 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 795 (5th Cir. 2007)). Accordingly, even though Brenham Oil is a Texas corporation with its headquarters in Texas, we afford less deference to its choice of forum because its alleged injuries arose from its travels to Togo in search of an oil concession in foreign waters.

Before a case can be dismissed for forum non conveniens, the court must identify another forum that could hear the case. *Reyno*, 454 U.S. at 254 n.22, 102 S. Ct. at 265 (1981). The party seeking dismissal bears the initial burden of showing that the proposed alternative forum is available and adequate. *Quixtar*, 315 S.W.3d at 33. Once a court has determined that there is an adequate alternative forum that may hear the cause, it must weigh private- and public-interest factors to

determine whether forum non conveniens dismissal is appropriate. *See Quixtar*, 315 S.W.3d at 33–34.

### A.    Available and adequate alternative forum

"A 'foreign forum is available when the entire case and all the parties can come within the jurisdiction of that forum.'" *Vinmar*, 336 S.W.3d at 674 (quoting *Sarieddine v. Moussa*, 820 S.W.2d 837, 841 (Tex. App.—Dallas 1991, writ denied)). "[A]n alternative forum is adequate if the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Pirelli Tire*, 247 S.W.3d at 678 (internal quotations omitted); *accord Vinmar*, 336 S.W.3d at 674. "The substantive law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there." *Vinmar*, 336 S.W.3d at 674 (quoting *DTEX*, 508 F.3d at 796).

The trial court entered the following findings of fact and conclusions of law pertaining to the availability and adequacy of a Togolese forum:

- "Brenham's claims against TGS may be tried in the Republic to [sic] Togo."

- "The Republic of Togo offers an adequate remedy for Brenham's claims against TGS."

41

- "The Republic of Togo is an available alternative forum."

- "Jurisdiction over Brenham and TGS exists in the Republic of Togo."

Brenham Oil, however, argues that Togo is neither an available forum nor an adequate forum to hear its tortious interference claim against TGS.

### 1. Availability of forum

Relying on the declaration of its expert witness, former Togolese judge Kokouvi Pius Agbetomey, Brenham Oil contends that Togo is not an alternative available forum because the substantive law of the forum precludes a Togolese court from exercising jurisdiction over this dispute. Although TGS stipulated that it would submit to the jurisdiction of a Togolese court for purposes of resolving this dispute, Brenham Oil points to Agbetomey's statement that a Togolese court nevertheless lawfully could not exercise jurisdiction over two foreign corporations:

> A Togolese judge may not, without risking a violation of said procedural provisions [of the Togolese Code of Civil Procedure], accept a referral of this nature concerning a civil case with regard to two subjects incorporated in the United States that do not have their domiciles in Togo.

Brenham Oil asserts that TGS's submission to the jurisdiction of Togo does not satisfy the availability prong. Thus, Brenham Oil concludes that TGS failed to satisfy its burden to show that Togo is an available forum.

Brenham's evidence notwithstanding, TGS offered the declaration of its own expert witness, Togolese attorney Vienyemenu Florent Jonas Sokpoh, who reached

42

the opposite conclusion on the jurisdictional question. Brenham Oil contends that Sokpoh's declaration could not be considered by the court because it was not authenticated, but when determining an issue of foreign law, a trial court may consider "any material or source, whether or not admissible." TEX. R. EVID. 203 (providing procedures for determining foreign law).

Sokpoh opined that "in all cases, the exception for the lack of jurisdiction in Togolese law must be raised before any basic defense or any flat refusal." Thus, he concluded, "[i]f Brenham were to file suit in the Togolese courts, they would not be able to declare themselves without jurisdiction if neither of the parties raises this exception of lack of jurisdiction." Furthermore, Sokpoh asserted that Togo's Hydrocarbon Code expressly requires Brenham Oil's claims to be filed in Togo. In the declaration, Sokpoh explained his reasoning on both points, providing citations to the Togolese Code of Civil Procedure, Hydrocarbon Code, and Penal Code (which, he explained, could be referenced by analogy for questions of civil law").

Brenham Oil disagrees with Sokpoh's legal opinions, arguing that his interpretation of the Togolese Hydrocarbon Code is mistaken. Notably, however, Agbetomey did not give an opinion about the disputed provisions of the Hydrocarbon Code. When conducting a common-law forum non conveniens analysis, courts have considered the uncontroverted testimony of a foreign law expert sufficient to support a trial court's determination that a foreign forum is

available. *See Robinson v. TCI/US West Comms. Inc.*, 117 F.3d 900, 908 (5th Cir. 1997); *accord Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1282–83 (11th Cir. 2001). Brenham Oil further argues that Sokpoh was unqualified and unreliable, but it did not object to his qualifications or reliability at the trial court level. As a result, Brenham Oil has waived any error on these grounds. TEX. R. APP. P. 33.1(a); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 411 (Tex. 1998) (holding that a challenge to the reliability of scientific expert witnesses must be timely made to preserve error).

Finally, Brenham Oil argues that Togo should not be considered an available forum because, according to Agbetomey, the courts of Togo lack authority to compel the testimony of Togolese officials like Siah who participated in the negotiations with Brenham Oil. This argument is misdirected. The "availability" component of a forum non conveniens analysis centers on whether "the entire case and all the parties can come within the jurisdiction of that forum." *See Vinmar*, 336 S.W.3d at 674. The availability of compulsory process for the attendance of witnesses is properly addressed as a private-interest factor. *See In re Gen. Elec. Co.*, 271 S.W.3d 681, 688 (Tex. 2008) ("Ordinarily, an alternate forum is shown if the defendant is 'amenable to process' in the other jurisdiction."); *Gulf Oil*, 330 U.S. at 508, 67 S. Ct. at 843 (listing "availability of compulsory process for attendance of unwilling witnesses" as a private-interest factor).

We conclude that the trial court did not abuse its discretion in relying upon TGS's expert opinion evidence to conclude that a Togolese forum was available. *See Robinson*, 117 F.3d at 908.

## 2. Adequacy of forum

Brenham Oil presents several reasons why it contends Togo is an inadequate forum to try its tortious interference claim. It first asserts that "the enforceability of a judgment in Togo is questionable" and that "TGS provided no evidence beyond an unsupported conclusion in the Court's findings and conclusions that any judgment would be able to be enforced." This challenge fails to account for the legal presumption that the substantive law of the foreign forum is presumed to be adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there. *Vinmar*, 336 S.W.3d at 674. Brenham Oil identifies nothing in the record to overcome this presumption and support its contention that enforceability of a judgment is questionable.

Brenham Oil also argues that Togo is an inadequate forum because, according to its expert Agbetomey, Togolese courts may not compel a foreign national to testify during a civil trial and Togo does not try civil cases before juries. The latter consideration, standing alone, does not render an alternative forum inadequate. *See Vinson v. Am. Bureau of Shipping*, 318 S.W.3d 34, 45 (Tex.

45

App.—Houston [1st Dist.] 2010, pet. denied). The former consideration, as previously explained, is properly examined as one of the private-interest factors. *See Gulf Oil*, 330 U.S. at 508, 67 S. Ct. at 843.

We conclude that the trial court did not err in finding that Togo is an available and adequate alternative forum.

### B. Private- and public-interest factors

Once a court has determined that there is an adequate alternative forum that may hear the cause, it must weigh the canonical private- and public-interest factors enunciated in *Gulf Oil* to determine whether forum non conveniens dismissal is appropriate. *See Quixtar*, 315 S.W.3d at 33–34. When reviewing the trial court's decision to dismiss based on forum non conveniens, we must not conduct a de novo review of the evidence by mechanically reweighing each forum non conveniens factor. *Quixtar*, 315 S.W.3d at 35. The United States Supreme Court has refused to "lay down a rigid rule to govern discretion," noting that "[e]ach case turns on its facts." *Reyno*, 454 U.S. at 249; 102 S. Ct. at 263. If "central emphasis were placed on any one factor, the forum non conveniens doctrine would lose much of the flexibility that makes it so valuable." *Id*. at 249–50; 102 S. Ct. at 263. Admittedly, the various factors weighed by the trial court "may be difficult to quantify." *Quixtar*, 315 S.W.3d at 35.

46

### 1. Private-interest factors

The private-interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; (3) the possibility of view of premises, if view would be appropriate to the action; (4) the enforceability of a judgment once obtained; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Gulf Oil*, 330 U.S. at 508, 67 S. Ct. at 843; *Quixtar*, 315 S.W.3d at 33. With respect to these private-interest factors, Brenham Oil contends that the majority of witnesses are located in Texas, the majority of the evidence is located in Texas, the alleged acts of tortious interference occurred in Texas or were supervised and directed from Texas, and a Togolese trial would be inordinately expensive. It relies on the fact that both parties are headquartered in Texas and that a large amount of discovery has already taken place while the case has been pending in the trial court. Furthermore, Brenham Oil argues that, according to its expert witness, the Togolese courts may not compel foreign nationals or the Togolese government officials to testify.

We do not agree that the trial court abused its discretion in weighing the private-interest factors. Brenham Oil's arguments focus on what it claims is the superior availability of evidence and witnesses in Houston, as well as the greater convenience to the parties of trying the case in a jurisdiction where they are

headquartered. While Brenham Oil is correct that both its own witnesses, such as Gaille and Hardy, and the members of TGS's AMEAP team who are based in Houston, such as Hicks and Abdallah, are convenient to Houston and subject to service of a subpoena, there are other material witnesses who are located in Togo and Israel. The Togolese government was assisted at the negotiations with Brenham Oil by Yair Green, an Israeli lawyer, and Raphael Edery, an Israeli economic adviser. It is undisputed that Siah and his superior Dammipi Noupokou, the Togolese Minister of Energy and Mines, are located in Togo. TGS asserts that it is unable to obtain vital defense testimony in a Texas court because the Togolese witnesses refused to participate in discovery in Texas, and their testimony could not be secured through the Texas court because Togo is not a party to the Hague Convention on the Taking of Evidence Abroad. As shown in its findings of fact and conclusions of law, the trial court took the location of foreign witnesses into account, writing, "all material witnesses other than Brenham's witnesses, are located in Togo or Israel, and this Court has virtually no means to compel their testimony; the individual responsible for sending the correspondence to Togo, which is the basis for Brenham's claim against TGS, is located in the United Kingdom, and is no longer employed by any TGS entity . . . ."

TGS stressed before the trial court that securing the testimony of Siah and Noupokou would be critical for its defense. To recover for tortious interference

with prospective business relations, the plaintiff must demonstrate that the alleged interference prevented the plaintiff from securing a contract. *See Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475–76 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (delineating the tort's elements). TGS argued that without the testimony of the Togolese decisionmakers, Siah and Noupokou, it would be unable to explore the causes of Togo's decision to award Block 2 to ENI rather than Brenham Oil.

Brenham Oil's contention that the alleged tortious interference occurred in Houston notwithstanding, it is undisputed that, if the Togolese were in fact influenced by Welch's negative letter to Siah, then the letter must have swayed Togolese officials located in Togo. *See In re Omega Protein*, 288 S.W.3d 17, 21–22 (Tex. App.—Houston [1st Dist.] 2009) (orig. proceeding) (granting mandamus petition to obtain forum non conveniens dismissal of claims against company headquartered in Texas when accident occurred in Virginia and "persons with the most knowledge" of the alleged tort were located in Virginia). In addition to the testimony of the Togolese officials themselves, any internal correspondence or memoranda of the officials and Togolese government is presumably located in Togo. *See Vinmar*, 336 S.W.3d at 677. Thus, as a matter of the availability of evidence, the effect of the letter in Togo is significant to establishing the validity of claims at issue. Given the potential importance of foreign witnesses and any

Togolese documentary evidence to determining the effect that TGS's alleged interference had on the Togolese government, the trial court could have reasonably weighed the first and second private-interest factors in favor of dismissal. *See Vinmar*, 336 S.W.3d at 677 (upholding forum non conveniens dismissal when appellees' evidence "showed that much of the pertinent documentary evidence and witnesses [were] located in Mexico"); *Omega Protein*, 288 S.W.3d at 21–22.

The other considerations adduced by Brenham Oil, such as the expense of trial in Togolese courts that use the French language, the large amount of discovery already conducted in Harris County, and the opinion of its expert that Togolese courts cannot compel witness testimony, do not demonstrate that the trial court abused its discretion. Although courts must consider as a private-interest factor "all other practical problems that make trial of a case easy, expeditious and inexpensive," the need for a Texas company to travel to a foreign nation and seek relief in courts that use a different language is not determinative. *See Quixtar*, 315 S.W.3d at 33 (holding that is error for a court to require that every *Gulf Oil* factor favor dismissal); *DTEX*, 508 F.3d at 801 (discounting hardship to plaintiff of litigating in foreign forum when its claims arose from its decision to make purchases overseas). Moreover, a trial in Houston involving potential British, Israeli, and Togolese witnesses, as well as documents written in French and Hebrew, would carry its own set of expenses and inexpediencies. *See Pirelli Tire*,

247 S.W.3d 678–79 (observing that litigation in either forum would necessitate some amount of travel and translation). Furthermore, the court was entitled to consider and credit the opinion of TGS's expert Sokpoh that the accumulated evidence would be admissible in a Togolese proceeding, and that Togolese courts could compel the testimony of witnesses located in Togo.

Finally, we note that our conclusion affords great deference to the trial court's determination. Although Brenham Oil asserts that the trial court could only have dismissed the case "if TGS were able to prove that all *Gulf Oil* factors weighed strongly in favor of Togo," that is not the proper standard. *See Quixtar*, 315 S.W.3d at 33. Here, the trial court reasonably could have weighed the private-interest factors in favor of dismissal by giving greater weight to the availability of evidence in Togo than to the language barrier or other practical difficulties for the parties of taking the case to Togo. *See, e.g.*, *SES Prods., Inc. v. Aroma Classique, LLC*, No. 01–12–00219–CV, 2013 WL 2456797, at \*6 (Tex. App.—Houston [1st Dist.] June 6, 2013, no pet.) (mem. op.) (finding that trial court's balancing of factors was reasonable, even though defendants "evidentiary showing under the private-interest factors could have been stronger," because "the *Gulf Oil* factors provide for a flexible inquiry, with no one factor being dispositive").

## 2. Public-interest factors

The public-interest factors are: (1) the administrative difficulties for courts when litigation is piled up in congested centers instead of being handled at its origin; (2) the burden of jury duty that ought not to be imposed upon the people of a community with no relation to the litigation; (3) local interest in having localized controversies decided at home; and (4) avoiding conflicts-of-law issues. *Gulf Oil*, 330 U.S. at 508–09, 67 S. Ct. at 843; *Quixtar*, 315 S.W.3d at 33–34.

Brenham Oil does not address the first factor, claiming that administrative problems and docket congestion are "minimally relevant" to this case. Further, characterizing "jury duty as an unlikely burden under the circumstances," it essentially concedes that the second factor does not weigh heavily for or against dismissal.

Instead, Brenham Oil argues that the third and fourth public-interest factors—local interest in having localized controversies decided at home and avoiding conflicts-of-law issues—strongly favor litigation in Texas. It emphasizes that both parties are headquartered in Houston and asserts that "TGS's actions arose directly in Houston or were supervised and approved of by TGS in Houston." Brenham Oil attempts to contrast these facts from those in two recent decisions of this court, *Vinmar* and *Benz Group*. *Vinmar* involved a suit by two Mexican corporations against a company headquartered in Texas with extensive

international operations. 336 S.W.3d at 667. Brenham Oil relies on the following passage:

> Texas jurors do not have a strong interest in resolving a dispute arising from Mexican business transactions, contracts executed in Mexico, and alleged torts emanating from Mexico, directed toward a multinational corporation that thrives on conducting business in emerging international markets. Significantly, this controversy arose in Mexico and primarily involves Mexican residents.

*Id.* at 679–80. Brenham Oil points out that the court in *Benz Group* quoted this language in support of a forum non conveniens dismissal of claims initiated by Texas plaintiffs against Brazilian defendants. 404 S.W.3d at 99. Thus, Brenham Oil relies on the fact that this case, unlike *Vinmar* and *Benz Group*, involves both a Texas plaintiff and Texas defendant.

The difference Brenham Oil seeks to highlight between the facts of this case and those in *Vinmar* and *Benz Group* is an imperfect one. While Brenham Oil is correct that the parties in this case, unlike those in the prior decisions, are both Texas residents and that the alleged torts could be said to have "emanated" from the Houston-based AMEAP team, other reasons relied upon in support of dismissal in *Vinmar* and *Benz Group* similarly apply to the dispute between Brenham Oil and TGS. Looking at the record before the trial court, the present controversy is fairly characterized as arising from a prospective Togolese "business transaction" and involves a corporation, Brenham Oil, with hopes to "thrive" by "conducting business in emerging international markets." As Gaille stated in his letter to Welch,

53

Brenham Oil is "a new vehicle that I am using to place capital in international exploration opportunities."

In *Benz Group*, the court, after quoting the above language from *Vinmar*, said that the defendant "adduced evidence that Brazil was the main location for the negotiations, agreements, alleged misdeeds, and ongoing business relevant to the dispute." *Id.* Those facts, not the residence of the parties, were what the *Benz Group* court found significant in *Vinmar*'s analysis. Furthermore, those facts have parallels in the present dispute, even though, unlike the *Benz Group* defendant, TGS is a Texas company. Brenham Oil's negotiations took place in Togo with Togolese officials and their Israeli advisers, the alleged misdeed was to interfere with those negotiations, and the projected "ongoing business relevant to the dispute," the drilling, would have allegedly eventuated in Togolese waters.

Brenham Oil contends that Texas law would apply to its claims. However, it supports this contention by referring to a section of its brief discussing the jurisdiction of the Togolese courts over the parties. In the absence of argument or authority to the contrary, the trial court was entitled to weigh the possibility that foreign law would apply to the suit in favor of dismissal. *See Vinmar*, 336 S.W.3d at 679 (noting that the mere possibility that foreign law may ultimately apply has been treated a factor militating in favor of forum non conveniens dismissal); *SES Prods.*, 2013 WL 2456797, at *6 (same).

Brenham Oil has not demonstrated that the trial court abused its discretion in weighing the private- or public-interest factors. We therefore conclude that the trial court did not err in dismissing Brenham Oil's suit for forum non conveniens. As we affirm the judgment of the trial court dismissing Brenham Oil's claims, we need not address the jurisdictional issues raised in TGS's cross-appeal, which we dismiss as moot. *See Vinmar*, 334 S.W.3d at 671–72 (a court may dismiss a case for forum non conveniens and bypass jurisdictional issues when judicial economy is best served thereby) (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431, 127 S. Ct. 1184, 1191–92 (2007)).

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Huddle.