COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| EMO TRANS, INC., | § | No. 08-20-00200-CV |
| Appellant, | § | Appeal from the |
| v. | § | 41st District Court |
| INMOBILIARIA AXIAL, S.A. de C.V., | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2019DCV3980) |

## **O P I N I O N**

This interlocutory appeal stems from the trial court's denial of Appellant EMO Trans, Inc.'s (EMO Trans) special appearance filed pursuant to Texas Rule of Civil Procedure 120a. Appellee Inmobiliaria Axial, S.A. de C.V. (Axial), the plaintiff in the underlying case, is the owner of a warehouse in Juarez, Mexico. Axial filed suit against EMO Trans and one of its employees to recover lease payments owed by warehouse tenant Empresa Mexicana Organizadora de Servicios Logisticos S. de R.L. (Empresa). EMO Trans objected to the trial court's exercise of general and specific jurisdiction, arguing it was not "at home" in Texas and Axial's claims did not arise out of or relate to any of EMO Trans' purposeful contacts with Texas. The trial court denied EMO Trans' special appearance. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

EMO Trans is a New York corporation with its headquarters and principal place of business in Garden City, New York. Operating as a cargo logistics company, the business facilitates supply chain solutions for customers in the U.S. and other cities worldwide. The company maintains offices nationwide including three in Texas. One such office is located in El Paso. Out of EMO Trans' nearly four hundred employees in the United States, only thirty-eight are based in Texas. None of whom are officers of the corporation.

Axial is a Mexican corporation headquartered in Juarez, Mexico. Relevant to this appeal, Axial owns a warehouse in Juarez which was subject to two, sequential leases. In 2008, Axial leased warehouse space to Empresa (Lease 1) for a two-year term. After Lease 1 expired in 2010, Axial entered a second lease with Empresa for additional warehouse space (Lease 2). No party disputes that both leases were entered into by Axial and Empresa, and EMO Trans was not a named party to either lease.[1] EMO Trans acknowledges it stored its customers' cargo in the leased Mexican warehouse but it does not specify during which lease or for what duration.[2]

Axial alleges Empresa failed to make timely lease payments during three different time periods: July 2009 through October 2009; March 2012 through May 2012; and January 2014 through October 2016. Although many payments were ultimately resolved, Axial eventually sued Empresa in Mexico to recover unpaid rent and to evict the company from the Juarez warehouse. Axial successfully obtained a judgment of $1.6 million against Empresa, which it then domesticated in Texas. In February 2019, Axial demanded payment of the judgment from EMO

---

[1] There is no copy of the written lease included in our record.

[2] In its brief, EMO Trans contends it was no longer using the warehouse for storage between 2014 through 2016, which it asserts is the time period relevant to the underlying lawsuit.

Trans. When EMO Trans refused, Axial filed the underlying suit against EMO Trans and its employee Ernesto Yoshimoto.

Axial alleged that Yoshimoto, acting as the agent of EMO Trans, gave multiple assurances and representations that it would honor and comply with the "lease/financial obligations" of Empresa. Specifically, Axial asserted that EMO Trans' executives attended multiple meetings held at a Starbucks in El Paso. Axial contended the meetings concerned material matters pertaining to the warehouse lease in Mexico. Axial also contended that EMO Trans' Houston office was the point of contact for matters concerning the Mexican lease.[3]

Axial pleaded allegations of breach of contract, collateral estoppel, fraud, and joint enterprise, and sought actual, nominal, consequential, and exemplary damages. Following service of process, EMO Trans filed a special appearance. EMO Trans contended it was not subject to personal jurisdiction in the state of Texas as to the entire case and as to all claims asserted against it. Specifically, EMO Trans contended there was no statutory or constitutional basis for the trial court to exercise personal jurisdiction over it as to the claims asserted by the suit.

In support of its special appearance, EMO Trans provided the affidavit of Thomas Harlin, an Executive Vice President and Chief Financial officer of the corporation. Harlin averred that EMO Trans had never entered into an agreement of any kind with Axial, nor made any assurances or promises to it with respect to a lease that Axial had entered with Empresa. Harlin further averred that EMO Trans had no corporate ownership, no corporate affiliation, nor any affiliation with Empresa, and none of its corporate officers or employees were corporate officers or employees of Empresa. Harlin acknowledged, however, that EMO Trans had previously stored its customers' cargo in the Juarez warehouse that Empresa had leased from Axial.

---

[3] Axial did not proffer any of the written representations made by EMO Trans or any evidence of payments made.

3

When Axial served written discovery on EMO Trans and Yoshimoto, they both objected to all inquiries and requests for production. Axial filed a motion to compel urging it was entitled to discovery to the extent of EMO Trans' special appearance. Axial also responded to EMO Trans' special appearance and included an affidavit of Juan Alvarez, founder and sole administrator of Axial. Alvarez averred that, starting in 2008, he had an office in El Paso where he worked on a daily basis. To the extent he had phone communications and email exchanges with EMO Trans, he asserted those communications occurred in El Paso. Among other assertions, Alvarez claimed that EMO Trans' corporate executives made promises and assurances "that EMO Trans would honor and comply with lease obligations of its Mexican operations."

Following a non-evidentiary hearing, the trial court denied EMO Trans' special appearance, entering a general order without any associated findings of fact and conclusions of law. This interlocutory appeal then followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (authorizing interlocutory appeal from the denial of a special appearance).

## II. DISCUSSION

In two issues, EMO Trans asserts the trial court erred in ruling it was subject to personal jurisdiction in Texas.

### A. Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). To reach that question, however, a trial court must sometimes resolve questions of fact. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Thus, we review a trial court's denial of a special appearance under a mixed standard of review. *Western Technologies, Inc. v. Omnivations II, L.L.C.*, 583 S.W.3d 786, 791 (Tex. App.—El Paso 2019, no pet.). We defer to the trial court's

4

resolution of contested facts so long as the findings are supported by legally and factually sufficient evidence. *Id*. We review de novo the trial court's application of those facts to the law. *Id*.

When no findings of fact and conclusions of law are filed by the trial court, as is applicable here, all relevant facts that are necessary to support the judgment and supported by the evidence are implied. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018); *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 883 (Tex. App.—El Paso 2005, pet. denied). When the appellate record includes the reporter's record and clerk's record, the implied findings are not conclusive and may be challenged for legal and factual sufficiency. *I & JC Corp.,* 164 S.W.3d at 883-84.

Initially, the plaintiff bears the burden to plead sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). This notice-pleading requirement is "minimal" and "can be satisfied with an allegation that the nonresident defendant is doing business in Texas or committed tortious acts in Texas." *Gaddy v. Fenenbock*, No. 08-22-00041-CV, 2022 WL 2965964, at *7 (Tex. App.—El Paso July 27, 2022, no pet.). Once the plaintiff satisfies the initial burden, the defendant challenging jurisdiction has the burden to negate all bases for personal jurisdiction and focus its arguments to allegations in plaintiff's pleading. *Omnivations*, 583 S.W.3d at 791. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Kelly*, 301 S.W.3d at 658.

Personal jurisdiction can be negated on either a factual or legal basis. *Id.* at 659. Factually, "the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id*. The defendant may attack the legal basis for personal jurisdiction in

any of the following ways: challenging the legal sufficiency of the jurisdictional facts; showing that its contacts do not rise to the level of purposeful availment; for specific jurisdiction, that the plaintiff's claims do not arise from the defendant's contacts; or that the exercise of jurisdiction offends the traditional notions of fair play and substantial justice. If a nonresident defendant has presented evidence to disprove the jurisdictional allegations, the plaintiff must respond with evidence establishing personal jurisdiction over the nonresident defendant. *Id.*

**B. Applicable law**

A Texas court may exercise personal jurisdiction over a nonresident defendant when doing so is permitted by the Texas long-arm statue and the exercise of jurisdiction is consistent with federal and state due-process guarantees. *Bell*, 549 S.W.3d at 558; *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016); *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-.045 (long-arm statute). Under the long-arm statute, a nonresident is present in Texas for purposes of personal jurisdiction when the nonresident is doing business in the state. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Kerlin v Sauceda*, 263 S.W.3d 920, 927 (Tex. 2008). Doing business in this state includes certain acts by a nonresident such as: "(1) contract[ing] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" and "(2) commit[ting] a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2).

Still, even if the long-arm statute permits the exercise of jurisdiction over a nonresident defendant, a court's jurisdiction is also limited by the Due Process Clause of the U.S. Constitution. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007) ("Federal due-process requirements limit a state's power to assert personal jurisdiction over a nonresident defendant."). Such constitutional protection guarantees that a party cannot be bound by the judgment of a forum

6

with which the party has established no meaningful contacts, ties, or relations. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995). In short, the long-arm statute extends a Texas court's personal jurisdiction but only as far as the federal constitutional requirement of due process will permit. *See Moki Mac*, 221 S.W.3d at 575. A Texas court can exercise jurisdiction over a nonresident defendant only if "(1) the defendant has established 'minimum contacts' with the state and (2) the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *TV Azteca*, 490 S.W.3d at 36 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see also Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

Minimum contacts exist when the nonresident defendant purposefully avails itself of the privilege of conducting activities in the forum state invoking the benefits and protections of its laws. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009). Purposeful availment is the "touchstone" of jurisdictional due process. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). To determine whether a nonresident defendant availed itself of the benefits of Texas law, we look to (1) the relevant contacts of the defendant, not the unilateral activity of another party or a third person; (2) whether the contacts are purposeful rather than random, fortuitous, isolated, or attenuated; and (3) whether the defendant seeks some benefit, advantage, or profit by availing itself of the jurisdiction. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). The purposeful availment test focuses on the defendant's efforts to avail itself of the forum, not on the form of the cause of action chosen by the plaintiff. *Moki Mac*, 221 S.W.3d at 576. The minimum-contacts requirement protects due-process rights by permitting a state to exercise jurisdiction over a nonresident defendant only when the defendant "could reasonably anticipate being haled into court there." *Moncrief Oil*, 414 S.W.3d at 152.

A nonresident defendant's minimum contacts may give rise to two types of personal jurisdiction: general and specific. *TV Azteca*, 490 S.W.3d at 37. If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2016) (such contacts essentially render the defendant "at home" in the forum state). This test requires "substantial activities within the forum" and presents "a more demanding minimum contacts analysis than for specific jurisdiction." *BMC Software*, 83 S.W.3d at 797. When the requisite level of activities in the forum are established, a court may exercise jurisdiction even if the cause of action did not arise from activities performed in the forum state. *Spir Star*, 310 S.W.3d at 872. In contrast, when specific jurisdiction is alleged, the minimum-contacts analysis focuses on the "relationship among the defendant, the forum, and the litigation." *Moki Mac*, 221 S.W.3d at 575-576 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)). Specific jurisdiction is triggered only "if the defendant's alleged liability 'arises out of or is related to' an activity conducted within the forum." *Id*. at 576 (quoting *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 n.8 (1984)).

Even when a nonresident has established minimum contacts with a state, the second prong of the due process inquiry requires proof that a state's exercise of jurisdiction over the nonresident defendant comports with "traditional notions of fair play and substantial justice." *TV Azteca*, 490 S.W.3d at 55 (quoting *Int'l Shoe*, 326 U.S. at 316; *Moncrief Oil*, 414 S.W.3d at 154). Under this requirement, courts must consider several factors to evaluate the fairness and justness of exercising jurisdiction over a nonresident defendant:

> (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering

8

fundamental substantive social policies.

*Id.* at 55 (citing *Moncrief Oil*, 414 S.W.3d at 155). Moreover, when the defendant is a citizen of a foreign country, and not just another state, we consider additional factors to include: "(6) the unique burdens placed upon the defendant who must defend itself in a foreign legal system; (7) the state's regulatory interests; and (8) the procedural and substantive policies of other nations whose interests are affected as well as the federal government's interest in its foreign relations policies." *Id.* (quoting *Guardian Royal Exch. Assur.*, 815 S.W.2d at 229). A nonresident defendant may defeat jurisdiction by presenting "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* (quoting *Spir Star AG v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010)).

### III. PERSONAL JURISDICTION

EMO Trans assigns two errors to the trial court's denial of its special appearance. First, as a corporate defendant, it contends it is both domiciled and has its principal place of business in New York. It thus contends it is only "at home" in New York, and not subject to the exercise of general jurisdiction in Texas. Second, although EMO Trans acknowledges that it conducts cargo logistics business activities in Texas, it nonetheless contends it is not subject to the exercise of specific jurisdiction in Texas with regard to the claims asserted in Axial's suit.

We address both issues in turn.

### IV. GENERAL JURISDICTION

In its first issue, EMO Trans asserts it is not subject to general jurisdiction in Texas. Specifically, it asserts it is not "at home" in the state and no exceptional circumstance exists to confer such jurisdiction.

General or all-purpose jurisdiction describes a defendant with contacts so "continuous and

9

systematic 'as to render [it] essentially at home in the forum State.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). In such a case, "jurisdiction may be proper even without a relationship between defendant's particular act and the cause of action." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). As the United States Supreme Court has explained, however, it would be an "exceptional case" in which a company's activities in a state other than its principal place of business or formal place of incorporation might be "so substantial and of such a nature as to render the corporation at home in that State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014).

Axial does not dispute that EMO Trans is a New York corporation which is neither incorporated nor headquartered in Texas. Rather, Axial argued in the court below that the exercise of general jurisdiction over EMO Trans was proper based on it having three permanent offices in the state including one in El Paso. Indeed, the affidavit of Thomas Harlin, its Chief Financial Officer and Executive Vice President, indicates there are 38 employees who regularly work and conduct business in those three offices. But even so, Harlin further avers that EMO Trans "maintains 85 offices in 19 countries throughout the world, including the United States." Four hundred employees are employed nationwide; and no corporate officers are included among its 38 employees in the state.

Axial provides no information regarding EMO Trans' activities "in their entirety, nationwide and worldwide," and such information is critical because "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n.20; *see also Bryant v. Roblee*, 153 S.W.3d 626, 631 (Tex. App.—Amarillo 2004, no pet.) (finding evidence that nonresident defendant made an occasional loan to Texas residents "does not tell much about the quality and nature" of contacts, absent evidence showing, for example, where or

in what manner loans were made, or whether loan customers were individuals or entities). Absent contextual information, these kinds of contacts do not confer general jurisdiction. *See Daimler*, 571 U.S. at 139 n.20; *see also Bautista v. Trinidad Drilling Ltd.*, 484 S.W.3d 491, 503 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("[W]ithout evidence about the full nature of [defendant]'s business and contacts with Texas as compared to other forums, the record does not support the exercise of general jurisdiction based on the presence of a single employee in Texas."); *Brenham Oil & Gas, Inc. v. TGS-NOPEC Geophysical Co.*, 472 S.W.3d 744, 759 (Tex. App.— Houston [1st Dist.] 2015, no pet.) ("Occasional travel to Texas is insufficient by itself to establish continuous and systematic contact with the state."); *DENSO Corp. v. Hall*, 396 S.W.3d 681, 693-94 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (finding 155 trips to Texas by foreign corporation personnel over ten-year period did not support general jurisdiction because evidence did not establish general business presence).

Axial's allegations and the record evidence do not support an implied finding that EMO Trans' contacts with Texas were so substantial that it was "essentially at home" in Texas. *See Goodyear*, 564 U.S. at 919. As a result, we conclude that EMO Trans satisfied its burden to negate its unrelated contacts with Texas as a basis for the exercise of general jurisdiction. *See Kelly*, 301 S.W.3d at 659.

Accordingly, we sustain EMO Trans' first issue. Because Axial additionally alleged the trial court has specific jurisdiction over EMO Trans, we next address that second basis for the court's exercise of personal jurisdiction.

## V. SPECIFIC JURISDICTION

In its second issue, EMO Trans asserts the trial court erred in ruling that it was subject to the exercise of specific jurisdiction in Texas. A trial court can exercise personal jurisdiction when

11

a nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316; *Moki Mac*, 221 S.W.3d at 575. Minimum contacts requires that (1) there must be purposeful availment of the privilege of conducting activities in the state, and (2) the liability must have arisen from or be related to those contacts. *Moki Mac*, 221 S.W.3d at 576. Both requirements must be met. *Id.*

Because two cases of the Supreme Court of Texas guide our analysis, we begin our discussion with a review of the following cases, *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878 (Tex. 2017), and *Moki Mac*, 221 S.W.3d at 569.

**A.  *M&F Worldwide Corp. v. Pepsi-Cola Metropolitan Bottling Co.***

In *M&F Worldwide Corp.*, the nonresident plaintiff, Pepsi, filed suit against two sets of defendants, the Cooper defendants—not a party to the appeal—and the Mafco defendants. *M & F Worldwide Corp.*, 512 S.W.3d at 880. The basis of Pepsi's claims involved the effect of a 2011 settlement agreement that resolved a New York lawsuit filed by Pneumo Abex, LLC—a subsidiary of International Holdings—against the Cooper defendants. *Id.* The New York lawsuit arose from alleged disputes over indemnity obligations that some of the Cooper and Mafco defendants owed Pneumo Abex for asbestos-related claims. *Id.* In turn, Pneumo Abex had asbestos-related indemnity obligations to Pepsi, and, in this lawsuit, Pepsi asserted the settlement agreement interfered with those obligations. *Id.* Pepsi sued the Cooper and Mafco defendants alleging, by virtue of the settlement agreement, the parties to the agreement tortiously interfered with another nonresident company's indemnity obligations to Pepsi. *Id.* at 879-80. Pepsi alleged Texas had general and specific jurisdiction over the nonresident defendant, Mafco, alleging Mafco traveled to Texas to discuss the agreement and entered into contracts with the Cooper defendants, who were

Texas residents, and the agreement required substantial performance in Texas. *Id.* at 884. The trial court denied Mafco's special appearance, and the Houston Court of Appeals, Fourteenth District, affirmed. *Id.*

On review, the Supreme Court concluded the trial court lacked specific jurisdiction over the Mafco defendants. *Id.* at 890. Specifically, the Court held that plaintiff's allegations that the defendants "twice traveled to Texas to negotiate an allegedly tortious plan with [the Texas-resident Cooper defendants], developed that plan through hundreds of communications sent to Texas, and carried out that plan through agreements performed in Texas[,]" were not enough to meet the standard for specific jurisdiction. *Id.* at 886-87. The Court noted Pepsi did not allege the Mafco defendants committed any torts in Texas by negotiating the agreement, or that they committed any torts against Texas residents. *Id.* "The torts at issue—fraudulent transfer and tortious interference—hinge on the effect of the parties' execution of the New York settlement agreement and related conduct that occurred outside of Texas." *Id.* at 887. The Court held that, even assuming the evidence supported an implied finding that the parties "began formulating the plan" in Texas, such planning was insufficient as jurisdictional contacts. *Id.* at 888. Furthermore, the evidence did not indicate that the Mafco defendants' contacts with Texas involved any effort to get "extensive business in or from the forum state." *Id.* at 889.

Ultimately, the Supreme Court of Texas concluded that in "negotiating, executing, and carrying out the settlement agreement, the Mafco defendants did not seek to do business in Texas, commit a tort in Texas, or allegedly cause injury to Pepsi in Texas." *Id.* at 890. And it further noted, "to the extent the Mafco defendants purposefully directed activities toward Texas, Pepsi's causes of action [did] not arise from those contacts." *Id.*

13

### B. *Moki Mac River Expeditions v. Drugg*

In *Moki Mac*, Texas-resident plaintiffs were the parents of thirteen-year-old Andy Drugg, a boy who died in Arizona while on a river-rafting trip with Moki Mac River Expeditions, a Utah-based river-rafting outfitter. *Moki Mac*, 221 S.W.3d at 573. The Druggs learned of Moki Mac's excursions through another Texas resident who had contacted the company regarding a rafting trip. *Id.* The fellow Texas-resident was placed on the computerized mailing list to automatically receive a brochure for the upcoming season. *Id.* Moki Mac sent two brochures detailing pricing and schedules for upcoming excursions, which were shared with the Druggs' son. *Id.* The Druggs corresponded with representatives of Moki Mac before sending their son on the rafting trip. *Id.* Moki Mac sent the Druggs a letter confirming payment along with an acknowledgment-of-risk and release form, which was signed in Texas by Betsy Drugg and her son and returned to Moki Mac. *Id.*

The Druggs sued Moki Mac in Texas for wrongful death based on Moki Mac's negligence and for intentional and negligent misrepresentation. *Id.* The Druggs asserted that on the second day of the trip:

> Moki Mac guides led the group up an incline on a trail that narrowed around and was obstructed by a large boulder. The guides were positioned at the head and rear of the group, but no guide was present near the boulder. As Andy attempted to negotiate the boulder-blocked path, requiring him to lean back while attempting to cross a very narrow ledge, he fell backwards approximately fifty-five feet and was fatally injured.

*Id.* The trial court denied Moki Mac's special appearance and the Dallas Court of Appeals affirmed. *Id.*

The Supreme Court of Texas found the operative facts of plaintiffs' claims principally concerned the Moki Mac guides' conduct while on the hiking expedition, and whether they exercised reasonable care in supervising their thirteen-year-old son. *Id.* at 585. Such acts, the Court

found, had no substantial connection to Moki Mac's promotional activities in Texas. *Id*. Instead, the Court noted that Moki Mac's promotional activities of sending brochures to Texas, although they constituted numerous contacts satisfying purposeful availment, were "simply too attenuated to satisfy specific jurisdiction's due process concerns." *Id*. at 588. The Court held the injuries for which the plaintiffs sought recovery, based on the death of their son while on the hiking trail, did not have a substantial connection to the nonresident defendant's contacts with Texas, nor its promotional activities in the state. *Id*.

Based on guidance gleaned from *M&F Worldwide Corp*. and *Moki Mac*, we turn next to the jurisdictional inquiry of this case.

## C. Analysis

Axial asserts that EMO Trans established minimum contacts with Texas through its operation of a cargo logistics business. It asserts that EMO Trans: (1) maintains three offices within Texas, (2) has 38 employees located in Texas, and (3) derives business from Texas. Axial contends that because EMO Trans maintained such offices in the state, it has clearly demonstrated that EMO Trans purposefully availed itself of the privilege of conducting activities in the state and of being subject to specific jurisdiction. More specifically, Axial alleges EMO Trans made multiple assurances and representations in Texas for purposes of furthering its Texas business.

As an initial matter, EMO Trans asserts that Axial's attempt to merge EMO Trans with Empresa, as if the two are related and may be treated as the same corporate entity, is nothing more than "litigation flare." EMO Trans asserts the record reflects that Empresa has no relation to EMO Trans; thus, the two entities are separate. Harlin unequivocally testified that "EMO Trans has no corporate ownership, no corporate affiliation, or other interest in, and is not otherwise affiliated whatsoever with [Empresa Logisticos]." Axial gave no proof contradicting those assertions nor

15

supporting its view that EMO Trans and Empresa are related companies. More than conclusory references are needed to establish a corporate relationship between two entities such that they may be treated as if they are the same corporate entity. *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007) (holding that the contacts of distinct legal entities, including parents and subsidiaries, must be assessed separately for jurisdictional purposes unless the corporate veil is pierced). Thus, more than Axial's conclusory reference to Empresa as being EMO Trans' "Mexican operations" is needed to establish a corporate relationship between the two entities such that we may treat them as if they are the same corporate entity. Based on the record provided, we hold that any alleged connection between EMO Trans and Empresa is insufficient alone to subject EMO Trans to Texas courts' jurisdiction.

Turning to EMO Trans' relevant contacts with Texas, specific jurisdiction requires us to analyze jurisdictional contacts "on a claim-by-claim basis" to determine whether each claim arises out of or is related to the defendant's minimum contacts. *Moncrief Oil*, 414 S.W.3d at 150; *see also Kelly*, 301 S.W.3d at 660. However, in the event all claims arise from the same forum contacts, a separate analysis of each claim is not required. *Moncrief Oil*, 414 S.W.3d at 150-151. Axial contends: (1) its sole owner had at least a dozen meetings with executives of EMO Trans regarding the "Mexican lease space," all taking place at an El Paso Starbucks; (2) Axial's assistant met with EMO Trans' El Paso representative, on several occasions, around other parts of El Paso, and (3) multiple phone calls and emails took place between Axial and EMO Trans' Houston based office. Axial claims the alleged communications included representations to pay rent owed by Empresa, assurances that late payments would be made, and apologies for lack of payments. Also, it asserts all communications were made with EMO Trans' Texas representatives and the Houston office was a point of contact for issues regarding Lease 1 and with the parties' executing Lease 2. Lastly,

16

Axial claims all outstanding payments of Lease 1 were resolved by the El Paso and Houston offices. In short, Axial asserts "the contract at issue" was offered and accepted in Texas, promises and assurances were made in Texas, and "fraudulent statement and omissions" were made in Texas. Although Axial asserts EMO Trans made "fraudulent statements" during the meetings and communications, it further acknowledges that its claims did not arise until 2018, when EMO Trans denied payment on the judgment Axial had obtained against Empresa.

EMO Trans first denies any alleged assurances were made to Axial by EMO Trans and it further denies it entered into any purported agreement to pay rent for the leased warehouse in Mexico. But, even taking all of Axial's allegations as true, EMO Trans asserts that such claims fail to establish minimum contacts for the purposes of conferring personal jurisdiction in Texas because: (1) the alleged communications are irrelevant to the current dispute because many of the communications occurred during the term of Lease 1, such that any missed rent payments were since resolved and do not relate in any way to issues pertaining to Lease 2; (2) any alleged statements made during the term of Lease 2, occurring between March 2012 and May 2012, concerned missed payments that were ultimately resolved; (3) there are no allegations of any promises or assurances from EMO Trans concerning non-payment in 2014 or thereafter, which is the basis for the money judgment obtained in the Mexican lawsuit against Empresa; (4) the communications and meetings were fortuitous, random, and were all arranged by Axial; and (5) EMO Trans did not seek to gain any benefit, advantage, or profit by the meetings and communications with Axial.

The United States Supreme Court has provided that to determine whether a nonresident defendant purposefully establishes minimum contacts within the forum through a "contract," we must evaluate the factors of "prior negotiations and contemplated future consequences, along with

17

the terms of the contract and the parties' actual course of dealing[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 463 (1985). Also, it will not be sufficient to establish purposeful availment that a nonresident defendant contracted with a Texas company when there is no allegation of acts constituting a breach of the contract in Texas or allegations that the contract required the nonresident defendant to conduct activities in Texas. *Info. Servs. Group, Inc. v. Rawlinson*, 302 S.W.3d 392, 400 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Here, Axial has not shown how merely reaching an agreement in Texas constitutes minimum contacts when there is no allegation that the terms of the agreement required conduct to be performed in Texas or that EMO Trans committed a breach in Texas. Similar to those facts in *M&F Worldwide Corp.*, Axial makes no allegations that EMO Trans committed a tort against a Texas resident, a Texas entity, or that it's claims involved Texas property. *M & F Worldwide Corp.*, 512 S.W.3d at 889. We will assume the evidence supports an implied finding that the parties entered into an agreement. However, the evidence supporting that finding—the Texas meetings and phone calls whereby EMO Trans made promises and assurances to "back" Empresa's financial obligation—is insufficient to constitute minimum contacts with Texas. *Id.* at 887-90 (finding nonresident defendants' actions of negotiating, executing and carrying out a settlement agreement that was formulated in Texas was insufficient jurisdictional contacts when nonresident defendants did not seek to do business in Texas, commit a tort in Texas, or allegedly cause injury to plaintiff in Texas). Any effect of such agreement would be related to conduct that occurred and would occur outside of Texas, regarding the renting of space in a warehouse located in Mexico. Axial's allegation of meetings and verbal assurances occurring in Texas are insufficient to establish minimum contacts by EMO Trans with the forum state. *Cf. Moncrief Oil*, 414 S.W.3d at 153 (holding the trial court had specific jurisdiction over a nonresident defendant that attended

meetings in Texas with a Texas corporation and accepted trade secrets created in Texas regarding a potential joint venture in Texas with a Texas corporation). Said differently, the communications in Texas could have occurred anywhere and yet the basis of Axial's claim would remain the same.

Further, to the extent EMO Trans does conduct its cargo logistics business in Texas, Axial's causes of action do not arise from those contacts. As shown in *Moki Mac*, purposeful availment on its own will not support the exercise of specific jurisdiction. *Moki Mac*, 221 S.W.3d at 579. In addition to such purposefulness, there must be a substantial connection between the nonresident defendant's contacts with the forum-state and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. The operative facts of the litigation are "those facts that would be the focus of the trial." *Id.* at 588. Here, the operative facts of Axial's suit concern whether a valid contract existed between the parties, or alternatively, whether EMO Trans and Empresa are connected, and whether promises and assurances were made by EMO Trans that Axial relied upon to its detriment. We can predict the evidence at trial would focus on the terms of any lease agreement between the parties, the parties' connection to it, and any evidence to prove EMO Trans' agreement to back Empresa's lease obligations. Based on evidence of this nature, a trier-of-fact would be asked to make credibility determinations and determine whether EMO Trans breached a valid contract or made fraudulent assurances related thereto.

As in *Moki Mac*, we find no connection between the operative facts of Axial's litigation and EMO Trans' purposeful contacts with Texas. *Moki Mac*, 221 S.W.3d at 588. Axial fails to show a substantial connection between EMO Trans' cargo logistics business in Texas and the alleged claims of breach of contract and fraudulent assurances and promises, which principally concern entities and property located in Mexico. *See, e.g.*, *Brocail v. Anderson*, 132 S.W.3d 552, 564 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding alleged tort arose from the

19

exercise of medical judgment from defendant doctor in prescribing course of physical therapy in Michigan, and not from the doctor's minimum contacts with Texas through communicating that prescription to Texas); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 844, 855 (5th Cir. 2000) (holding that although there were minimum contacts with Texas through a Syrian oil company signing a contract for the killed workers' services, there was no specific jurisdiction when the plaintiff's claims did not arise out of those contacts but from alleged tortious acts committed in Syria); *see also Burton v. Honeywell Int'l Inc.*, 614 S.W.3d 271, 283 (Tex. App.—Tyler 2020, no pet.) (holding no substantial connection between defendant's purposeful contacts with Texas—maintaining offices, employees, and marketing activities in Texas—and plaintiff's allegations arising from plane crash in Texas when the products liability claim did not relate to the corporations' business activities in Texas); *Megadrill Servs. Ltd. v. Brighouse*, 556 S.W.3d 490, 500 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding plaintiff's alleged slip and fall accident did not arise out of or relate to the work performed in Texas to refurbish the rig and therefore there was no specific jurisdiction over defendants); *Wilco Farmers v. Carter*, 558 S.W.3d 197, 206 (Tex. App.—Texarkana 2018, no pet.) (holding the operative facts of plaintiff's claims against defendant, whether defendant exercised reasonable care in unloading trucks, training, and supervising employees in Oregon, had no substantial connection to defendant's contacts with Texas, having a twenty-year business relationship with business in ordering goods from Texas).[4]

_____

[4] Lastly, we note EMO Trans also asserts an argument that Axial cannot force its claims into the broad language of the Texas long-arm statute. First, it asserts Axial's breach of contract claims will not confer personal jurisdiction because the statute "extends over a nonresident who does business in Texas, but only if the nonresident 'contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state,'" and, therefore, both requirements are missing because Axial is not a Texas resident and any performance was tied to Mexico. Also, EMO Trans asserts Axial's fraud claims are time barred. We note, however, that it is well recognized that the broad language of Texas' long-arm statute will extend personal jurisdiction only "as far as the federal constitution requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795 (quoting *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). Because we conclude the trial court's exercise of personal jurisdiction over EMO Trans does not comport with the federal due process limitations, we need not further address EMO Trans' arguments regarding the inapplicability of the long-arm statute to the facts of this case.

Because we find that EMO Trans lacks the minimum contacts with Texas required to exercise specific personal jurisdiction over Axial's causes of action, it is not necessary for us to determine whether the exercise of jurisdiction would offend traditional notions of fair play or substantial justice. *Kelly*, 301 S.W.3d at 661 n.10 ("Because we decide this case based on the lack of alleged minimum contacts with Texas, we do not discuss the fair-play-and-substantial-justice prong of personal jurisdiction."); *see also* TEX. R. APP. P. 47.1.

Accordingly, we sustain issue two.

## VI. REMAND AND JURISDICTIONAL DISCOVERY

Axial requests in its briefing, in the event we find the trial court erred in denying the special appearance, that we remand the case to the trial court to allow additional time for jurisdictional discovery. *See* TEX. R. CIV. P. 120a(3) (governing jurisdictional discovery); *see also Lamar v. Poncon*, 305 S.W.3d 130, 139 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Rule 120a(3) provides that a trial court may order a continuance to permit discovery to be had or depositions to be taken, or make any other order as is just, where it appears from the affidavits of a party opposing a special appearance that he cannot, for reasons stated in the affidavit, present facts essential to justify its opposition to the special appearance."). "Jurisdictional discovery can be a vital part of resolving a special appearance." *See Lamar*, 305 S.W.3d at 139 (citing *Exito Elecs. Co., Ltd. v. Trejo*, 142 S.W.3d 302, 307 (Tex. 2004)).

EMO Trans asserts, however, that jurisdictional discovery will not change any facts. Specifically, EMO Trans argues that most of Axial's discovery requests were aimed to support its argument on general jurisdiction, which EMO Trans further contends, Axial somewhat abandoned on appeal. Moreover, EMO Trans asserts any requests relevant to specific jurisdiction "covered pre-2014 meetings, at which Axial would have been present, and communications, of which Axial

21

initiated, and alleged lease payments made in Juarez by EMO Trans that EMO Trans has already indicated do not exist." EMO Trans urges any further discovery would not change any facts because EMO Trans has already negated any allegations that such requests seek to show, and evidence of payments made by EMO Trans simply do not exist.

Under these circumstances, we agree it would be inappropriate to remand to the trial court to consider whether to allow additional jurisdictional discovery. Axial does not, at trial or on appeal, make a request for discovery that would reveal the existence of sufficient minimum contacts. Rather, its requested discovery would simply result in, if any existed, evidence of EMO Trans' agreement to pay rent obligations of Empresa for a warehouse located in Mexico. This evidence, as discussed above, would not legally meet the due process standard for establishing minimum contacts in Texas.

## VII. CONCLUSION

Because we hold that neither general nor specific jurisdiction exists over EMO Trans as a matter of law, we conclude the trial court erred in denying EMO Trans' special appearance. We reverse the trial court's order denying EMO Trans' special appearance and remand the case for severance and dismissal of the claims against EMO Trans.

GINA M. PALAFOX, Justice

October 12, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

22