

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00242-CV

———————————————

RAJESH MANDALAPU AND SRAVEK TECHNOLOGIES, LLC, Appellants

V.

VASU TECHNOLOGIES, LLC AND BRIAN BOEHMER, Appellees

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-337301-22

Before Birdwell, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

In this interlocutory appeal, Appellants Rajesh Mandalapu and Sravik[1] Technologies, LLC (Sravik) raise two issues challenging the denial of their special appearance in which they contend that a Texas court did not have specific jurisdiction to adjudicate claims brought against them by Appellees Vasu Technologies, LLC (Vasu) and Brian Boehmer. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (interlocutory appeal); Tex. R. Civ. P. 120a (special appearance). Because we conclude that the trial court erred by denying the special appearance, we will reverse and render.

## II. BACKGROUND

This case involves multiple parties and non-parties who provided IT services for "an end-client user," which in this case was the Defense Logistics Agency (DLA). DLA is an agency within the Department of Defense that does logistical handling of everything from military hardware to food for American troops stationed around the world. Pertinent here, DLA contracted with Alamo City Engineering Services (ACES) to "put a new system in to manage [DLA's] warehousing and also to manage the transportation logistics." Resolute Solutions, LLC (Resolute)—an IT staffing

---

[1]While Appellants' notice of appeal spelled the name "Sravek," other record references, including Appellants' answer, indicate that the name is spelled "Sravik." Indeed, Appellants' counsel spelled the name "Sravik" at the hearing on the special appearance, and Appellees' counsel also spelled the name "Sravik" at a deposition. On appeal, all briefs spell it "Sravik." Therefore, we will use the spelling "Sravik."

company whose business involved recruiting and contracting with various IT consultants—provided services to DLA, the "end-client user."[2]   Resolute had contracts with Sravik and an entity named either Red Commerce, Inc. (Red Commerce) or RED Global, who in turn contracted with Vasu or Boehmer.[3] Mandalapu—who owns Sravik—was a supervisor of Boehmer.

In September 2022, Appellees Vasu and Boehmer sued Appellants Mandalapu and Sravik alleging a single cause of action for "tortious interference with existing contract."  As alleged in the pleadings, before the expiration of the contract with Red Commerce, Boehmer was informed that the contract had been terminated. According to Appellees,

> [Appellants] willfully and intentionally interfered with the contract by communicating to third-parties unsupported reasons for termination including baseless allegations regarding [Appellee's] performance.  No performance issues (or any other issues) had ever been communicated to [Appellees] regarding performance issues under the contract. [Appellants'] tortious interference proximately caused the contract to be terminated, with [Appellee] Boehmer ultimately losing his employment.

---

[2]Other portions of the record state that ACES was Resolute's "customer" and that DLA was Resolute's "end customer."

[3]Boehmer was employed by Vasu and did computer software consulting and programming for it.  Appellees' pleadings state that Vasu had a contract with Red Commerce whereby Boehmer would provide IT services to Red Commerce.  A copy of that contract was attached to Appellees' pleadings.  At the special appearance hearing, however, Boehmer testified and his attorney stated that the contract was with RED Global.  The record is not clear about how Red Commerce and RED Global are related, if at all.

Appellants answered the suit and filed a special appearance challenging personal jurisdiction, contending that neither Appellant "does business in Texas, maintains offices in Texas[,] nor has sufficient minimum contacts with Texas to confer jurisdiction on Texas [c]ourts." The special appearance included Mandalapu's affidavit, wherein he stated the following:

- He was a resident of St. Louis, Missouri.

- Sravik was a Missouri limited liability company with its principal place of business in St. Louis, Missouri.

- Neither he nor Sravik did business in Texas or maintained offices in Texas.

- Sravik contracted with Resolute, a Wyoming limited liability company headquartered in Sheridan, Wyoming, for the provision of IT services.

- Neither he nor Sravik had any contractual relationships with any persons or business entities in Texas, and specifically, neither had a contractual relationship with Appellees.

- As part of his employment with Sravik, as a contractor for Resolute, he supervised eighteen people and/or businesses across the country and, at the time of the loss Appellees complain of in their petition, he was supervising twelve such people and/or businesses.

- His supervisory activities took place from his business location in St. Louis, Missouri.

- Sravik did not "conduct business" in Texas.

- Sravik was contractually required by Resolute to oversee the work of myriad IT businesses and personnel throughout the United States.

4

- Sravik provided services to Resolute but not to Appellees or any other entity.

The trial court set a hearing on the special appearance. At the conclusion of the first hearing, the trial court continued it to allow Appellees to amend their pleadings.

Prior to the continued hearing, Appellees amended their pleadings and filed a response to Appellants' special appearance. The amended pleadings again alleged a single cause of action for tortious interference of a contract and did not change the wording of the paragraph addressing that cause of action.

The response to the special appearance stated that the "jurisdictional analysis involves specific jurisdiction, as the cause of action for tortious interference arises out of the IT consulting work performed by Boehmer and Mandalapu for the DLA project in Corpus Christi, Texas." It added the following "jurisdictional facts":

- Mandalapu executed a contract for the provision of IT consulting services with Resolute. Paragraph 4.7 of the contract contains an arbitration provision, mandating arbitration in Houston, Texas; paragraph 12.1 contains a Texas choice of law provision. The statement of work in the exhibit to the contract indicates ACES (located in San Antonio, Texas) as the end-user client. Resolute maintains a branch office in Houston, Texas.

- Mandalapu traveled to Corpus Christi, Texas, four times in connection with IT consulting services performed for the DLA project.

- The visits occurred in January 2021, January 2022, April 2022, and May 2022.

- Two of these visits involved actual physical on-site visits to the DLA facility in Corpus Christi, Texas, where Mandalapu interacted with various consultants on the project, many of whom were Texas residents.

- The remaining two visits involved work from the hotel conference room in Corpus Christi, Texas.

- In addition to Boehmer, Mandalapu supervised twelve to eighteen other IT consultants, three of whom were Texas residents, including Boehmer, on the DLA project.

- The prime contract for the DLA project was awarded to ACES in San Antonio, Texas. ACES formed a team of consultants designated as "Team ACES."[4] Mandalapu was a member of Team ACES and maintained a Team ACES email address that he utilized for various work on the DLA project.

- In supervising Boehmer, Mandalapu assigned tasks, tracked status, provided technical help, and managed vacation requests. Mandalapu conducted regular one-on-one meetings via phone or Microsoft Teams with Boehmer throughout the work on the DLA project.

- Mandalapu also conducted weekly and monthly team meetings with all IT consultants that he supervised, which included Boehmer and the three other Texas residents.

- In addition to his supervisory role, Mandalapu also interviewed approximately twenty consultants, six of whom were hired to work on the DLA project.

In addition, Appellees attached Mandalapu's January 5, 2023 deposition to the response.

---

[4]In his deposition, Mandalapu testified that "Team ACES doesn't exist physically," but it is a way of referring to the group of consultants as a whole.

Prior to the continued hearing, Appellants filed a supplement to their special appearance, in which they argued that the three "particularly pertinent" jurisdictional facts cited in the amended pleadings—that Appellants had a contract with a third party that has a branch office in Texas and that contains a Texas choice of law provision; that Appellants traveled to Corpus Christi, Texas, four times; and that Appellants sent "at least two" e-mails to Boehmer during one of Appellants' work trips to Corpus Christi—were insufficient to assert specific jurisdiction over Appellants.

At the continued hearing, Appellees called Boehmer as a witness, and he explained that he worked on a contract with DLA involving installing a new system to manage DLA's warehousing and transportation logistics. Boehmer testified that the "prime" contract with DLA was awarded to ACES in San Antonio, Texas, which created a "ghost entity" consisting of anyone who worked on the project. According to Boehmer, Mandalapu was a member of this entity, a "team lead," and Boehmer's supervisor. A total of four people on the team were Texas residents. To staff the job with IT consultants, ACES used Resolute. Boehmer's employment contract was with RED Global. Boehmer stated that Corpus Christi, Texas, was the "pilot location where they were rolling out all of their - - the software so that DLA could convert to this warehousing management software and transportation software." To Boehmer's knowledge, Mandalapu made four trips to Corpus Christi, Texas, to work on the DLA

7

project. Boehmer averred that he had some type of interaction with Mandalapu on a weekly basis.

At the conclusion of Boehmer's testimony, the trial court asked, "[W]hat facts do you have about where the tortious interference occurred?" Appellees' counsel responded, "The answer to your first question, 'Where did it occur?' We don't know yet. . . . This cause of action relates to and arises out of this Corpus Christi job. That's all I have to show for jurisdictional analysis." Appellees' counsel also stated that provisions in the Resolute contract regarding arbitration and choice of law did not relate to Appellees' assertion of specific jurisdiction.[5]

At the hearing's conclusion, the trial court denied the special appearance and later entered an order to that effect. Appellants requested findings of fact and conclusions of law, which were entered. Although Appellants requested amended and additional findings and conclusions, none were entered. Appellants appeal from the order denying their special appearance.

## III. DISCUSSION

In their first issue, Appellants complain that the trial court erred in denying their special appearance "(a) when [Appellees] failed to carry their initial burden to plead sufficient allegations to bring [Appellants] within the reach of Texas' long[-]arm statute—i.e.[,] for their tortious interference claim, that [Appellees] committed the

---

[5]The trial court's findings of fact and conclusions of law do not refer to any such contractual provisions.

tortious acts in Texas; and (b) [Appellants] each proved that they are not Texas residents." In their second issue, Appellants ask if "the trial court ha[d] specific personal jurisdiction over [them] when (a) the evidence is legally insufficient to establish that [they] had sufficient minimum contacts with Texas; (b) as a matter of law[,] [Appellants'] contacts with Texas fall short of purposeful availment; and (c) as a matter of law, there is no substantial connection between any of [Appellants'] contacts with Texas and the operative facts of this litigation (the claim for tortious interference with an existing contract)."

## A. Standard of Review and Applicable Law

A party may challenge a Texas court's exercise of personal jurisdiction over it by filing a special appearance under Texas Rule of Civil Procedure 120a. *See* Tex. R. Civ. P. 120a. As the Texas Supreme Court recently explained:

> Texas courts may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute so provides and (2) the exercise of jurisdiction "is consistent with federal and state due process guarantees." "Our long-arm statute reaches as far as the federal constitutional requirements for due process will allow," so Texas courts may exercise personal jurisdiction over foreign defendants "having such 'contacts' with the forum [s]tate that 'the maintenance of the suit' is 'reasonable[ ] in the context of our federal system of government' and 'does not offend traditional notions of fair play and substantial justice.'" This "minimum contacts" inquiry is a "forum-by-forum" or "sovereign-by-sovereign" analysis that examines "the nature and extent of 'the defendant's relationship to the forum'" to determine whether the defendant is amenable to general or specific jurisdiction.

*State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (footnotes omitted).

9

A defendant's contacts with the forum can give rise to either general or specific jurisdiction. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021) (citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010)). A court has general jurisdiction over a nonresident defendant whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (alteration in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127, 134 S. Ct. 746, 754 (2014))). Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, -- U.S. --, 141 S. Ct. 1017, 1024 (2021)).

Both parties agree that only specific jurisdiction—not general jurisdiction—is at issue here. With specific jurisdiction, a minimum-contacts showing requires two things: (1) that "the defendant purposefully avails itself of the privilege of conducting activities in the forum state[;]" and (2) "the suit 'arise[s] out of or relate[s] to the defendant's contacts with the forum[.]'" *Id.* at 8–9. When assessing whether minimum contacts are satisfied, we look only to the defendant's contacts and not the "unilateral activity" of some third party. *Id.* at 9 (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) and *Burger King v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40 (1958))).

In a challenge to either type of personal jurisdiction, the parties bear shifting burdens of proof. *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). As we explained in *Southwire Co., LLC v. Sparks*, No. 02-21-00126-CV, 2021 WL 5368692, at *3–4 (Tex. App.—Fort Worth Nov. 18, 2021, no pet.) (mem. op.), resolution of a special appearance involves a "complicated procedural sequence":

- "[T]he plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658.

- "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* The defendant's burden is "tied to the allegation in the plaintiff's pleading." *Id.*

- "If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute . . ., the defendant need only prove that it does not live in Texas to negate jurisdiction." *Id.* at 658–59. To correct the failure to allege jurisdictional facts, the plaintiff should amend to include "necessary factual allegations." *Id.* at 659.

- "The defendant can negate jurisdiction on either a factual or legal basis." *Id.*

  - "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id.*

  - To negate jurisdiction on a legal basis,

    the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and

11

> substantial justice are offended by the exercise of jurisdiction.
>
> *Id.*
>
> - Should the defendant make a factual challenge to the plaintiff's jurisdictional allegations, "[t]he plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id.* (footnote omitted).

*Southwire*, 2021 WL 5368692, at *3–4.

Rule 120a of the Texas Rules of Civil Procedure requires that a special appearance be determined on the pleadings, any stipulations by the parties, affidavits and attachments filed by the parties, results of discovery, and any oral testimony. *See* Tex. R. Civ. P. 120a(3); *see also Kelly*, 301 S.W.3d at 658 n.4 (stating that while pleadings are essential to frame the jurisdictional dispute, they are not dispositive, and additional evidence under Rule 120a "merely supports or undermines the allegations in the pleadings").

A court's authority to exercise jurisdiction over a nonresident defendant is a question of law that we review de novo. *Volkswagen*, 669 S.W.3d at 413. If a trial court enters an order denying a special appearance and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *BMC Software Belgium, NV v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We may review the fact findings for both legal and factual sufficiency. *Id.* Appellate courts review a trial court's conclusions of law as a legal

question.  *Id.*  The appellant may not challenge a trial court's conclusions of law for factual insufficiency; however, the reviewing court may review the trial court's legal conclusions drawn from the facts to determine their correctness.  *Id.*

## B.  Analysis

While set out in two issues, the controlling issue in this appeal is whether the relevant facts give rise to specific jurisdiction over Appellants.  The only relevant prong of the Texas long-arm statute is Section 17.042(2), which provides jurisdiction over a nonresident who "commits a tort in whole or in part in this state."[6]  Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).

Appellants argue that the trial court's order should be reversed because "minimum contacts requires not only purposeful availment but also proof that the alleged liability—here the claim of tortious interference—arises from or relates to the forum contacts."  And because Appellees "have admitted they do not know where the alleged tortious interference occurred, and the trial court's Findings of Fact and Conclusions of Law do not include a finding that the alleged tortious interference occurred in Texas," Appellants urge that Appellees have not satisfied their burden for specific jurisdiction.

---

[6]Appellees' response to the special appearance states not only that Appellants "are subject to the personal jurisdiction of the Texas courts under the theory of specific jurisdiction" but also that the long-arm statute allows the exercise of personal jurisdiction under Section 17.042(2).

In their claim of specific jurisdiction, Appellees argue that their jurisdictional pleading allegations satisfy their initial burden and that the assertion of specific jurisdiction over Appellants comports with constitutional guarantees of due process:

> Appellants' minimum contacts with Texas such as travel to Texas, working on a Texas-based project, and supervising Texas residents all establish sufficient minimum contacts. Appellants['] contacts were purposeful, as they were directly related to the rollout of the DLA project in Corpus Christi, Texas. Finally, Appellants' contacts were "related to" the operative facts of this litigation. Boehmer's claim for tortious interference with existing contract arose directly out of the supervisory role between Boehmer and Mandalapu. Mandalapu supervised, evaluated, and provided feedback on Boehmer's job performance relating to the DLA project. The tortious interference claim arises out of Boehmer's employment contract during the DLA project and therefore, Mandalapu's alleged liability "relates to" his contacts with Texas.

Appellants respond that Appellees have "grossly mischaracterized" their consulting and supervisory IT services, which they provide under their contract with Resolute. Also, Appellants contend that Appellees have failed to show that their claim for tortious interference arises out of or relates to their contacts in Texas, stating that Appellees "provide no evidence or argument that the alleged communications about Boehmer's poor performance took place in Texas." Moreover, Appellants note that the trial court afforded an opportunity to conduct discovery for jurisdictional purposes, including depositions, wherein they could have "questioned [Appellants] about the alleged communications with Red Commerce or others regarding [Appellees'] poor performance, including, where those alleged communications occurred," but "they did not."

14

Based on the shifting burdens of proof, we look first at the plaintiff's pleadings for jurisdictional facts. *See Kelly*, 301 S.W.3d at 658. "If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute (i.e., for a tort claim, that the defendant committed tortious acts in Texas), the defendant need only prove that it does not live in Texas to negate jurisdiction." *Id.* at 658–59.

In their live pleading—the second amended petition—Appellees alleged that Mandalapu is a resident of St. Louis, Missouri, and Sravik is a Missouri limited liability company with its principal place of business in Missouri. Appellants confirm these facts in the affidavit attached to their special appearance.

Appellees' pleadings set out facts that they state are "particularly pertinent to the allegations of specific jurisdiction," including:

> Mandalapu traveled to Corpus Christi four times in connection with the IT consulting services performed for the DLA project. The visits occurred in January 2021, January 2022, April 2022, and May 2022. Two of these visits involved actual physical on-site visits to the DLA facility in Corpus Christi, Texas, where Mandalapu interacted with various consultants on the project, many of whom were Texas residents.
>
> The remaining two visits involved work from the hotel conference room in Corpus Christi, Texas.

However, the live pleadings contain no allegations that any tortious conduct occurred in Texas. And there is no explanation of what was said or done at the Corpus Christi visits that relate to the claims against Appellants. *See Julian v. Cadence McShane Constr. Co., LLC*, No. 01-15-00465-CV, 2015 WL 6755616, at *6 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, no pet.) (mem. op.) ("For actions occurring in Texas, Bedrich

15

asserts that Julian '[a]ttend[ed] multiple meetings in person with Cadence McShane in Texas.' But Bedrich offers no explanation of what was said or done at those meetings or how anything said or done at those meetings relate to any of their claims against Julian.").

Our sister court considered a similar pleading in *Vinmar Overseas Singapore PTE Ltd. v. PTT International Trading PTE Ltd.*, 538 S.W.3d 126, 132–33 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). There, Vinmar asserted numerous jurisdictional facts, including that "[t]he logistical operations underlying certain of the transactions that Defendants interfered [sic] took place in Houston, Texas," and that "[a] tort was committed in Texas." *Id.* at 132. Despite these and other alleged jurisdictional facts, the court concluded:

> Vinmar does not allege in any of its live pleadings or its response to the Amended Special Appearance the location for any of the alleged acts by PTT or Krishnan. Vinmar alleged that Krishnan and PTT misappropriated its trade secrets and confidential information, but it does not allege that the misappropriation occurred in whole or in part in Texas. Likewise, Vinmar does not allege facts showing where the alleged tortious interference with the employment agreement occurred, where the alleged business disparagement occurred, or where the alleged conspiracy occurred.

*Id.* at 134; *see Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 153, 157 (Tex. 2013) (holding nonresident defendant subject to jurisdiction for misappropriation of trade secrets claim where defendant obtained trade secrets in Texas but not for tortious interference claim where alleged acts of interference occurred outside of Texas and stating that "a nonresident directing a tort at Texas from afar is insufficient

16

to confer specific jurisdiction"); *see also M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 890 (Tex. 2017) (stating that "to the extent the Mafco defendants purposefully directed activities toward Texas, Pepsi's causes of action do not arise from those contacts" and holding that the trial court lacked specific jurisdiction over the Mafco defendants). Therefore, the *Vinmar* court affirmed the trial court's order granting the special appearance. *Vinmar*, 538 S.W.3d at 139.

Appellants rely heavily on the Texas Supreme Court's decision in *Kelly*. *See Kelly*, 301 S.W.3d at 653. In *Kelly*, as here, there were allegations that the defendant officers had a connection with Texas. *Id.* In explaining that connection, the supreme court cited to the majority opinion in the court of appeals: "The record reveals that performance under the construction contract was to be performed exclusively in Texas. The Officers sent and directed payments to [Appellee/Plaintiff] in Texas. Kelly made site visits to the Texas work site. The Officers received numerous invoices from Texas regarding the [hotel] project." *Id.* at 656–57 (citing *Kelly v. Gen. Interior Const., Inc.*, 262 S.W.3d 79, 86 n.5 (Tex. App.—Houston [14th Dist.] 2008), *rev'd*, 301 S.W.3d 653). However, the supreme court determined that the plaintiff had failed to plead facts within the reach of the Texas long-arm statute because it did not allege that the officers at issue committed any of the wrongdoing in Texas. *Id.* As the court explained,

17

GIC [General Interior Construction, Inc.] failed to plead facts within the reach of the long-arm statute because it did not allege that the Officers [Daniel Kelly and Laura Hofstatter] committed any tortious acts in Texas. As noted, GIC's live pleading contains no allegations that the Officers' wrongdoing occurred in Texas. Regarding the fraud claim, GIC did allege several fraudulent acts (e.g., providing false affidavits to Meristar and misrepresenting to GIC that it would be paid in full), but it did not allege that any fraudulent acts occurred in Texas. Regarding the trust-fund claims, GIC did not allege that the Officers used or retained the trust funds in Texas, nor that they submitted false affidavits to Meristar in Texas. Thus, although GIC has alleged two claims of wrongdoing, it has not alleged that any acts giving rise to these two claims occurred in Texas.

*Id.* at 659–60. Moreover, in *Kelly*, the court noted that "[t]he most relevant piece of [special appearance] evidence" was an affidavit of GIC's president stating that Hofstatter promised him payment. *Id.* at 660. But the affidavit "d[id] not state where this conversation occurred or make any connection with Texas" and was silent as to the "[o]fficers' Texas contacts related to its claims." *Id.*; *see Ascend Nat'l, LLC v. Ludders*, No. 14-20-00396-CV, 2022 WL 553123, at *6 (Tex. App.—Houston [14th Dist.] Feb. 24, 2022, no pet.) (mem. op.) (affirming order granting special appearance and stating that a visit to Texas "cannot be a jurisdictional contact for purposes of the fraud claim because there is no allegation or evidence establishing that Ludders made the alleged misrepresentation during that meeting").

Similar to *Kelly*, Appellees failed to plead that the alleged wrongful conduct occurred in Texas. *See Steward Health Care Sys., LLC v. Saidara*, 633 S.W.3d 120, 131 (Tex. App.—Dallas 2021, no pet.) (en banc) (affirming trial court's order granting Saidara's special appearance and stating that, although Saidara visited Texas in

connection with a sale, "[t]here is no allegation in the petition that Saidara made any misrepresentation during his visits to Texas"). Although Appellees contend generally on appeal that "Mandalapu's alleged liability 'relates to' his contacts with Texas," they are silent on how Mandalapu's Texas contacts related to their tortious interference with contract claims. *See Fisher v. Eagle Rock Custom Homes Inc.*, No. 14-18-00483-CV, 2020 WL 205975, at *7 (Tex. App.—Houston [14th Dist.] Jan. 14, 2020, no pet.) (mem. op.) ("Appellees asserted Fisher had certain activities in and contacts with the state but did not allege that those were tortious behaviors."). This silence was confirmed at the special appearance hearing, when Appellees' counsel conceded to the trial court that "[w]e don't know yet" where the tortious interference occurred.

In support of their argument that their pleadings are sufficient to satisfy the Texas long-arm statute, Appellees cite two Texas cases, both which were decided before *Kelly*. *See Ji-Haw Indus. Co., Ltd. v. Broquet*, No. 04-07-00622-CV, 2008 WL 441822 (Tex. App.—San Antonio Feb. 20, 2008, no pet.); *Thunderbird Supply Co., Inc. v. Williams*, 161 S.W.3d 731 (Tex. App.—Beaumont 2005, no pet.). In addition, both cases are distinguishable. As noted by our sister court, *Ji-Haw* involved a products liability claim surrounding the design, manufacture, and marketing of an XBOX gaming system. *Careington Int'l Corp. v. First Call Telemedicine, LLC*, No. 05-20-00841-CV, 2021 WL 1731753, at *3 (Tex. App.—Dallas May 3, 2021, no pet.) (mem. op.) (stating that *Ji-Haw* "is distinguishable from this case, which involves alleged tortious interference with a contract").

Similarly, *Thunderbird* involved allegations against thirteen corporations for designing, manufacturing, and marketing certain "toxic products." *Thunderbird*, 161 S.W.3d at 733. Again, there were no allegations of tortious interference with a contract. As noted by Appellees, the plaintiff there "pleaded that he was exposed to various toxic products designed, manufactured, and marketed by the defendants and that all or substantial parts of the events or omissions giving rise to the claims occurred in Texas."[7] While the Beaumont court held that the plaintiff had met his initial pleading allegations, it ultimately held that Thunderbird did not purposefully establish sufficient minimum contacts with Texas to support exercising jurisdiction over it. *Id.* at 736. Therefore, the court reversed the trial court's order denying Thunderbird's special appearance and dismissed the claims against it. *Id.*

Here, the trial court's findings of fact and conclusions of law do not include a finding that the alleged tortious interference with a contract occurred in Texas. With

---

[7]*Careington* rejected the argument that venue pleadings may be considered in determining the sufficiency of the pleadings for personal jurisdictional purposes:

> Careington also relies on its venue allegation that "a substantial part of the events giving rise to Careington's claims herein occurred in Collin County[, Texas]." But this doesn't expressly allege that First Call committed any conduct in Texas, nor does it carry such an implication. Careington's venue allegation could be true even if First Call had no contact with Texas, since its co-defendant—which allegedly breached the contract that First Call allegedly interfered with—allegedly has its principal place of business in McKinney, Texas.

*Careington*, 2021 WL 1731753, at *3.

regard to Mandalapu's visits to Texas and emails during the work trip, the trial court

entered the following findings of fact:

- "[Mandalapu's] supervision began in November 2021. As the DLA project progressed, Mandalapu traveled to Texas and visited the DLA facility in Corpus Christi, Texas[,] on four occasions."

- "These occasions were July 2021, January 2022, April 2022, and May 2022. On two of these visits, Mandalapu personally visited the DLA facility and met with DLA personnel, including other consultants working on the project. With respect to the two visits to Texas, Mandalapu worked from his hotel conference room."

- "On at least two occasions while in Texas, Mandalapu emailed members of the consulting team (including Boehmer), assigning various tasks and advising as to the details of his visit to the DLA facility."

- "The purpose of Mandalapu's visits to Texas was to physically inspect the DLA facility, learn the operational process, and gather technical data on the DLA processes, in order to design, test and implement the new IT system. Mandalapu gathered this information and then assigned various tasks to the consultants under his supervision, including Boehmer."[8]

---

[8]While these contacts arguably demonstrate that Appellants purposefully availed themselves of the privilege of conducting activities in Texas, they do not establish specific jurisdiction because they do not demonstrate that Appellants' liability arises from or relates to the forum contacts. "A claim arises from or relates to a defendant's forum contacts if there is a 'substantial connection between those contacts and the operative facts of the litigation.'" *TV Azteca*, 490 S.W.3d at 52 (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007)). "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Stauffer v. Nicholson*, 438 S.W.3d 205, 212 (Tex. App.—Dallas 2014, no pet.) (citing *Moncrief Oil*, 414 S.W.3d at 156). Here, the contacts relied upon by Appellees relate to Appellants' non-tortious conduct; as to Appellants' alleged tortious conduct, Appellees have not established that such conduct occurred in Texas, and, thus, Appellees have not established a substantial connection between Appellants' contacts with Texas and the operative facts of the litigation. *See Brenham Oil & Gas, Inc. v. TGS-NOPEC Geophysical Co.*, 472 S.W.3d 744, 765 (Tex.

While a conclusion of law stated that "the cause of action asserted by Plaintiff [Appellee] arises from and is related to Defendants' [Appellants'] purposeful activities within Texas," nowhere in its findings or conclusions does the trial court find that Appellants committed tortious interference with a contract in Texas.

The question under *Kelly* is whether Appellees have alleged that Appellants committed any tortious act in Texas. *See Careington*, 2021 WL 1731753, at *3. They have not. Because Appellees failed to plead jurisdictional facts, Appellants could and did meet their burden to negate all bases of jurisdiction by proving that they do not live in Texas. *See Kelly*, 301 S.W.3d at 660. Appellees do not challenge that fact, and indeed, they admit it in their live pleadings.

Therefore, considering the pleadings and the jurisdictional evidence, we hold that the trial court did not have personal jurisdiction over Appellants. We sustain Appellants' issues on appeal.

---

App.—Houston [1st Dist.] 2015, no pet.) (stating that the "operative facts" of the tortious interference claim "would be acts or communications assisting or encouraging TGS to malign Brenham Oil or otherwise interfere with its prospective business relations with Togo" and holding that the "Texas-linked evidence relied upon by Brenham Oil pertains only to ENT[']s non[-]tortious conduct in the purchase of seismic data from TCS" and that said "forum contacts are not the operative facts of the litigation and therefore are not contacts that will support an exercise of specific jurisdiction").

## IV. CONCLUSION

Having sustained Appellants' issues, we reverse the trial court's order denying the special appearance and render judgment dismissing the case for want of personal jurisdiction.

/s/ Dana Womack

Dana Womack
Justice

Delivered: December 21, 2023